Affirmed by published opinion. Judge WILLIAMS wrote the majority opinion, in which Senior Judge MICHAEL joined. Judge GREGORY wrote a dissenting opinion.
OPINION
WILLIAMS, Circuit Judge.
Mark H. Dickson and Carey D. Ebert, trustee in bankruptcy for Gravity, Inc., (collectively, Gravity) appeal the district court’s dismissal under Federal Rule of Civil Procedure 12(b)(6) of Gravity’s consumer class action claims against Microsoft Corporation and three original equipment manufacturers (OEMs)' — Compaq Computer Corporation (Compaq), Dell Computer Corporation (Dell), and PB Electronics, Inc. (PB) (collectively, the OEM Defendants)' — in the United States District Court for the District of Maryland. For the reasons set forth below, we affirm.
I.
In February 1999, Gravity filed this action in the United States District Court for the District of Columbia, alleging a “hub-and-spoke” conspiracy between Microsoft and the OEM Defendants to re *199 strain trade, in violation of § 1 of the Sherman Act, and a conspiracy to maintain Microsoft’s alleged monopolies[1] in the sale of operating systems,[2] word processing, and spreadsheet software, in violation of § 2 of the Sherman Act.[3] The proposed class action consists of two separate classes. The first class is composed of “United States purchasers, between October 20, 1993 and the present, of Microsoft Windows or MS DOS operating software ... installed and sold with personal computers compatible with Intel x86/Pentium architecture purchased directly from Compaq, Dell, or [PB].” (J.A. at 103.) The second class is composed of “United States purchasers, between October 20, 1993 and the present, of Microsoft word processing software and/or Microsoft spreadsheet software installed and sold with personal computers compatible with Intel x86/Penti-um architecture purchased directly from Compaq, Dell, or [PB].” (J.A. at 103.)
Gravity alleges that the OEM Defendants and Microsoft violated the Sherman Act by entering into licensing agreements with the following anticompetitive provisions: (1) a prohibition against removing icons, folders, or Start menu entries from the Windows desktop; (2) a prohibition against modifying the initial Windows boot sequence; (3) the integration of Internet Explorer (IE), Microsoft’s Internet browser software, and other application software with Microsoft’s operating software; and (4) the inclusion of long-term distribution contracts, exclusive dealing distribution arrangements, and per-processor license fees.[4]
In exchange for agreeing to these provisions, the OEM Defendants allegedly received various benefits, including discounts on software and “greater cooperation from Microsoft in product development.” Gravity, Inc. v. Microsoft Corp., 127 F.Supp.2d 728, 732 n. 5 (D.Md.2001); see also United States v. Microsoft Corp., 84 F.Supp.2d 9, 42 (D.D.C.1999) (stating that Compaq and several other OEMs enjoyed “early access to Windows source code”). Gravity also alleges that the agreements benefitted the OEM Defendants by allowing them to sell more computer hardware than they would have sold if the relevant software markets were competitive and by ensuring that the OEM Defendants would not be undercut by rivals offering either comparable hardware with lower-priced software or comparable hardware without software.
Gravity claims that the restrictive licensing agreements were predicated, at least in part, on the perceived threat from emerging “middle-ware” platforms. Gravity’s theory is that middleware platforms *200 feasibly could replace most operating software functions by allowing developers to write programs interfacing with middle-ware rather than the operating system.[5] United States v. Microsoft Corp., 253 F.3d 34, 74 (D.C.Cir.2001). The D.C. Circuit has explained the threat of middleware platforms to Microsoft’s monopoly in the operating systems market as follows:
If a consumer could have access to the applications he desired — regardless of the operating system he uses — simply by installing a particular browser on his computer, then he would no longer feel compelled to select Windows in order to have access to those applications; he could select an operating system other than Windows based solely upon its quality and price. In other words, the market for operating systems would be competitive.
Id. at 60. Gravity also alleges that Microsoft has faced challenges from competing operating software, such as DR DOS.
The restraints on trade in the licensing agreements allegedly have denied the class members the choice of competitive software products and have resulted in supra-competitive prices for Microsoft’s operating system and application software. Gravity does not allege any conspiracy between Microsoft and the OEM Defendants to set the resale price of the software. Instead, it claims that overcharges were passed on to the consumers by the OEM Defendants when the consumers purchased personal computers (PCs) from the OEM Defendants.
Microsoft and the OEM Defendants moved to dismiss the First Amended Complaint (FAC). While those motions were under submission, the Judicial Panel on Multidistrict Litigation transferred the action to the United States District Court for the District of Maryland, where it was coordinated with approximately sixty-four other antitrust actions against Microsoft. The other antitrust actions were consolidated into a single class action. Gravity’s complaint was not consolidated with these actions because it was the only complaint alleging claims against OEMs as defendants. In re Microsoft Corp. Antitrust Litig., 127 F.Supp.2d 702, 704 & n. 2 (D.Md.2001).
In January 2001, the district court dismissed Gravity’s FAC for failure to state a claim. Following this dismissal, Gravity moved for leave to file a Second Amended Complaint (SAC). In the SAC, Gravity alleged two separate vertical conspiracies between Dell and Microsoft and Compaq and Microsoft.[6] Gravity did not name PB as a defendant.[7] Gravity repeated its allegations of anticompetitive conduct and included a claim that Microsoft’s licensing agreements “bundl[ed] or t[ied] the distribution of Microsoft’s middleware, the Internet Explorer browser, with Microsoft’s Windows operating software.” (J.A. at 465.) The district court denied leave to file the SAC on the ground of futility, concluding that the SAC also failed to state a claim upon which relief could be granted.
On appeal, Gravity contends that both complaints allege proper claims under § 1 *201 and § 2 of the Sherman Act. Gravity also argues that the district court erred in applying the indirect purchaser rule of Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), to foreclose compensatory damages. We address each argument in turn.
II.
Before turning to our consideration of Gravity’s claims of error, a brief overview of the public enforcement action for injunc-tive relief brought by the federal government and nineteen states against Microsoft in the United States District Court for the District of Columbia is warranted.[8] See United States v. Microsoft Corp., 253 F.3d 34 (D.C.Cir.2001). In analyzing the § 2 claim against Microsoft, the D.C. Circuit upheld the district court’s finding that Microsoft has monopoly power in the market for operating system software for Intel-compatible PCs with its Windows software, which has gained more than 95% market share. See id. at 51-58. It further affirmed the district court’s finding that Microsoft had “engag[ed] in exclusionary [or anticompetitive] conduct ‘as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident’ ” for the purpose of maintaining its monopoly power in the operating systems market. Id. at 58. In detailing Microsoft’s anti-competitive conduct, the D.C. Circuit relied primarily on the same licensing agreements underlying Gravity’s complaint, although it focused on Microsoft’s dealings with all of the OEMs who entered into such agreements in the aggregate rather than two or three agreements in isolation. Specifically, the D.C. Circuit highlighted the prohibitions against: “(1) removing any desktop icons, folders, or ‘Start’ menu entries; (2) altering the initial boot sequence; and (3) otherwise altering the appearance of the Windows desktop.”[9] Id. at 61. It affirmed the district court’s conclusion that Microsoft used the restrictions in the licensing agreements to ensure the predominance of IE in the browser market, thereby gaining market share in the browser market for the purpose of maintaining Microsoft’s monopoly in the operating systems market.[10] Only the third restriction was held to have been justified by Microsoft’s need to protect its copyrighted work. Id. at 63. The D.C. Circuit held that the first two restrictions “represent uses of Microsoft’s market power to protect its monopoly, unredeemed by any legitimate justification” and, therefore, that Microsoft’s imposition of these restrictions violated § 2 of the Sherman Act. Id. at 64.
III.
With this background in mind, we evaluate the district court’s dismissal of Gravity’s complaint. When reviewing the district court’s grant of a motion to dismiss a Sherman Act complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), “we must determine whether allegations covering all the elements that comprise the theory for relief have been stated as re *202 quired.” Estate Constr. Co. v. Miller & Smith Holding Co., 14 F.3d 213, 220 (4th Cir.1994) (internal quotation marks omitted) (citing United States v. Employing Plasterers Ass’n, 347 U.S. 186, 189, 74 S.Ct. 452, 98 L.Ed. 618 (1954)); Mun. Utils. Bd. of Albertville v. Ala. Power Co., 934 F.2d 1493, 1501 (11th Cir.1991) (“A plaintiff must plead sufficient facts so that each element of the alleged antitrust violation can be identified.”). “Moreover, the allegations must be stated in terms that are neither vague nor conclusory.” Estate Constr. Co., 14 F.3d at 220-21. “Although we will assume that the plaintiffs can prove the facts that they allege in their complaint, ‘it is not ... proper to assume that ... the defendants have violated the antitrust laws in ways that have not been alleged.’ ” Id. at 221 (quoting Associated Gen. Contractors v. Cal. State Council of Carpenters, 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)).
At the outset, we note that although Gravity alleges violations of both § 1 and § 2, the district court did not separately examine the sufficiency of Gravity’s claims when it dismissed the FAC. The district court determined that the alleged § 1 and § 2 conspiracies were “coterminous” because they purportedly shared a common goal: maintaining Microsoft’s monopolies. Gravity, 127 F.Supp.2d at 730. Because the conspiracies “coalesce,” reasoned the district court, the sufficiency of both allegations “must be gauged by the elements of a section 2 claim.” Id. “Otherwise, plaintiffs could circumvent the requirements of a conspiracy to monopolize claim, including the requirement that a defendant be shown to have acted with the specific intent to monopolize, simply by characterizing their claim as one arising under section 1, whose elements of proof are not as stringent.” Id. We disagree with the district court’s reasoning in this regard. A § 1 violation “is legally distinct from that under § 2 ... though the two sections overlap in the sense that a monopoly under § 2 is a species of trade restraint under § 1.” United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 224 n. 59, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). The same kind of practices, therefore, may evidence violations of both. See Md. & Va. Milk Pro. Ass’n v. United States, 362 U.S. 458, 463, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960) (“[Sections [1 and 2] closely overlap, and the same kind of predatory practices may show violations of [both].”); E. Thomas Sullivan & Jeffrey L. Harrison, Understanding Antitrust and its Economic Implications § 6.08, at 258 (2d ed. 1994) ([The prohibition in § 2 against combinations or conspiracies] proscribes a great deal of the same behavior prohibited by § 1). Thus, even if Gravity failed to allege a § 2 claim, it is possible that it sufficiently alleged a § 1 claim. See, e.g., Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (describing the § 2 standard as “the more stringent monopoly standard”).
To establish a violation of § 1 of the Sherman Act,[11] Gravity must prove the following elements: (1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade. Oksanen v. Page Mem’l Hosp., 945 F.2d 696, 702 (4th Cir.1991) (en banc). If Gravity is able to prove a violation of § 1, it then must prove the existence of “antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defen *203 dants’ acts unlawful.” Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990); Continental Airlines, Inc. v. United Airlines, Inc., 277 F.3d 499, 508 (4th Cir.2002); Oksanen, 945 F.2d at 708; see generally 2 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶¶ 360-63, at 191-227 (1995). These requirements apply with equal force to Gravity’s claims for damages and injunctive relief; the only relevant distinction being that for injunctive relief, “the injury itself need only be threatened.” 2 Areeda & Hovenkamp ¶ 360b, at 193.
A.
With respect to the first element, in the FAC, Gravity alleged a single “hub-and-spoke,” or “rimless wheel” conspiracy among the OEM Defendants and Microsoft. A rimless wheel conspiracy is one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant’s involvement in each transaction. Kotteakos v. United States, 328 U.S. 750, 755, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (“[T]he pattern was that of separate spokes meeting at a common center, though we may add without the rim of the wheel to enclose the spokes.” (internal quotation marks omitted)). In Kotteakos, the Supreme Court made clear that a rimless wheel conspiracy is not a single, general conspiracy but instead amounts to multiple conspiracies between the common defendant and each of the other defendants. Id. at 768-69, 772, 66 S.Ct. 1239; Joseph F. McSorley, A Portable Guide to Federal Conspiracy Law 145 (1996) (“While the hub may view its dealings with the spokes as part of a single agreement, a spoke may be concerned simply with his or her own actions.”).
Gravity does not argue that it is able to meet the test for establishing a “rim” between the OEM Defendants and Microsoft.[12] (Appellant’s Br. at 53.) Instead, it urges us to follow the Sixth Circuit, which Gravity asserts has adopted the proposition that a rimless wheel conspiracy constitutes a single, general conspiracy in the context of the Sherman Act. See ElderBeerman Stores Corp. v. Federated Dep’t Stores, Inc., 459 F.2d 138, 146 (6th Cir.1972) (setting forth requirements for proving “rimless wheel” conspiracy); see also Impro Products, Inc. v. Herrick, 715 F.2d 1267, 1279 n. 14 (8th Cir.1983) (noting that “[t]here is some question whether the conspiracy provisions of Sections 1 and 2 of the Sherman Act apply to a hub-and-spoke conspiracy,” but declining to resolve the issue after suggesting that such a theory was appropriate). Nothing in the Supreme Court’s holding in Kotteakos, however, suggests that such a proposition is correct or permissible. Rather, the Supreme Court was clear: a wheel without a *204 rim is not a single conspiracy.[13] Kotteakos, 328 U.S. at 755, 66 S.Ct. 1239. Thus, we agree with the district court that Gravity’s attempt in its FAC to plead a single, rimless wheel conspiracy between the OEM Defendants and Microsoft must be rejected.
In an effort to cure its failure to allege a legally viable conspiracy, Gravity alleged in the SAC separate vertical conspiracies between Microsoft and Compaq and between Microsoft and Dell. Compaq and Dell argue that these allegations also are insufficient to demonstrate concerted action under § 1 because Gravity is unable, as a matter of law, to demonstrate that either shared with Microsoft “a unity of purpose or a common design and understanding.” Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) (internal quotation marks and citation omitted). As this court recently emphasized in Virginia Vermiculite, Ltd. v. HGSI, 307 F.3d 277, (4th Cir.2002), “concerted activity susceptible to sanction by section 1 is activity in which multiple parties join their resources, rights, or economic power together in order to achieve an outcome that, but for concert, would naturally be frustrated by their competing interests (by way of profit-maximizing choices).” Id. at *9. Gravity has sufficiently alleged that Microsoft and the OEM Defendants pooled their resources, rights, or economic power. Furthermore, to the extent Compaq and Dell argue that it was against their economic interests to enter into § 1 conspiracies with Microsoft, we note that Gravity has alleged that Compaq and Dell received financial and other benefits in exchange for entering into the licensing agreements. These allegations are sufficient for purposes of Rule 12(b)(6) to demonstrate that a § 1 conspiracy was economically plausible.[14] Cf., e.g., Spectators’ Communication Network, Inc. v. Colonial Country *205 Club, 253 F.3d 215, 220-22 (5th Cir.2001) (analyzing relevant caselaw and concluding that a vertical conspiracy could be shown under § 1 even though it likely would be against Anheuser Busch’s economic interest to conspire to restrain competition in a market in which it was a purchaser).
Moreover, “the ‘combination or conspiracy’ element of a section 1 violation is not negated by the fact that one or more of the co-conspirators acted unwillingly, reluctantly, or only in response to coercion.” MCM Partners, Inc. v. Andrews-Bartlett & Assocs., 62 F.3d 967, 973 (7th Cir.1995); In re Brand Name Prescription Drugs Antitrust Litig., 123 F.3d 599, 615 (7th Cir.1997) (noting that the wholesaler’s participation would be actionable even if the jury found that they “were tools of the manufaeturers-reluctant accomplices, yet not the less liable for that.”); see also United States v. United States Gypsum Co., 438 U.S. 422, 436 n. 13, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978) (“[T]he general rule [is] that a civil violation can be established by proof of either an unlawful purpose or an anticompetitive effect.”). The co-conspirators need not share the same motive or goal; it is sufficient to allege that the co-conspirators “acquiesc[ed] in an illegal scheme.” United States v. Paramount Pictures, Inc., 334 U.S. 131, 161, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); see also Va. Vermiculite, Ltd. v. W.R. Grace & Co., 156 F.3d 535, 541 (4th Cir.1998) (“It is not necessary that [Historic Green Springs, Inc.] have shared Grace’s alleged anticompetitive motive in entering into a proscribed restraint; it is sufficient that HGSI, regardless of its own motive, merely acquiesced in the restraint with the knowledge that it would have anticompetitive effects.”); Duplan Corp. v. Deering Milliken Inc., 594 F.2d 979, 982 (4th Cir.1979) (“Where, as here, the [defendants] were knowing participants in a scheme whose effect was to restrain trade, the fact that their motives were different from or even in conflict with those of the other conspirators is immaterial.”). Accordingly, Gravity’s allegations regarding the commercial license agreements are sufficient for purposes of 12(b)(6) to set forth two separate vertical conspiracies between Microsoft and Compaq and between Microsoft and Dell.
B.
We next address whether Gravity alleged facts which, if proven true, would establish that the two conspiracies separately imposed unreasonable restraints of trade in interstate commerce. Continental Airlines, 277 F.3d at 508. In assessing liability under § 1, courts generally evaluate agreements pursuant to one of three approaches. Id. at 508-09 (“[T]he Supreme Court has authorized three methods of analysis: (1) per se analysis, for obviously anticompetitive restraints, (2) quick-look analysis, for those with some procompetitive justification, and (3) the full ‘rule of reason,’ for restraints whose net impact on competition is particularly difficult to determine.”). Because the possibility of anticompetitive effects resulting from either licensing agreement is not obvious, we analyze the two licensing agreements at issue — individually—pursuant to the “full” rule of reason analysis.[15] Id.; cf., e.g., *206 Microsoft, 253 F.3d at 59-60 (applying full rule of reason analysis to claimed § 2 violations).
In the rule of reason analysis, “the reasonableness of a restraint is evaluated based on its impact on competition as a whole within the relevant market.” Oksanen, 945 F.2d at 708. This evaluation requires a showing of “anticompetitive effect” resulting from the agreement in restraint of trade. To have an “anti-competitive effect,” conduct “must harm the competitive process and thereby harm consumers.” Microsoft, 253 F.3d at 58. “[H]arm to one or many competitors will not suffice.” Id. “The [Sherman Act] directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself.” Id. (internal quotation marks omitted). Thus, an inquiry into the lawfulness of the restraint begins “by identifying the ways in which a challenged restraint might possibly impair competition.” 7 Areeda & Hovenkan^ 1503a, at 372. After identifying the type of possible harm to competition alleged, we must proceed “to determine whether that harm is not only possible but likely and significant,” which requires “examination of market circumstances,” including market power and share. 7 id. ¶¶ 1503a 1503b, at 374-77.
1.
Gravity alleges that Compaq’s and Dell’s agreements with Microsoft aided the maintenance of Microsoft’s monopolies in PC operating system, word processing, and spreadsheet markets. Aiding the maintenance of a monopoly theoretically could harm competition by affecting price and/or output in various ways. For instance, the agreements could allow Microsoft to leverage its market power in the relevant software markets to obtain advantage in some secondary market (such as the browser market), not based upon consumer choice or efficient performance but from the mere fact of Microsoft’s market power in the primary market. See Microsoft, 253 F.3d at 62-66 (finding anticompet-itive effects resulting from Microsoft’s licensing agreements with OEMs based upon Microsoft’s leveraging of monopoly power in operating system market to suppress competition in the browser market); see generally Robin Cooper Feldman, Defensive Leveraging in Antitrust, 87 Geo. L.J.2079, 2080, 2098 (1999) (discussing “traditional leveraging theory” and the “Chicago school” leveraging theory and concluding that “defensive leveraging” can create the potential for harm to consumers by aiding in the maintenance of the primary monopoly). Similarly, with respect to the exclusive dealing components of the licensing agreements, the potential harm to consumers is that rival software firms or browsers will be foreclosed from access to consumers, denying consumers competitive choice and allowing supracompetitive pricing with respect to the software markets for which Microsoft has monopoly power. Per-processor fees also arguably could “discourage OEMs from licensing competing operating systems and/or cause OEMs to raise the price for PCs with a competing operating system to recoup the fee paid to Microsoft,” theoretically resulting in increased prices for Microsoft’s soft *207 ware and decreased opportunities for rival software firms to gain access to consumers. United States v. Microsoft Corp., 159 F.R.D. 318, 323 (D.D.C.1995), rev’d on other grounds, 56 F.3d 1448 (D.C.Cir.1995); see generally Kenneth C. Baseman et al, Microsoft Plays Hardball: The Use of Exclusionary Pricing and Technical Incompatibility to Maintain Power in Markets for Operating System Software, 40 Antitrust Bull. 265, 267-68 (1995) (criticizing per-processor licenses).
“Theorizing about conceivable impairments of competition does not, of course, prove that any such impairment has occurred or is likely,” or much less is “substantial in magnitude.” [16] 7 Areeda & Ho-venkamp ¶ 1503a, at 373. Thus, we next must examine whether Gravity sufficiently has alleged the likelihood of a substantial anti-competitive harm caused by the two licensing agreements at issue (considered individually), an inquiry that requires Gravity to allege facts demonstrating “that the defendants played a significant role in the relevant market.” Oksanen, 945 F.2d at 709; see also General Leaseways, Inc. v. Nat’l Truck Leasing Ass’n, 744 F.2d 588, 596 (7th Cir.1984) (stating that in rule of reason analysis, the plaintiff must “prove that the defendant has sufficient market power to restrain competition substantially. ... If not, the inquiry is at an end; the practice is lawful”); 7 Areeda & Hovenkamp ¶ 1503b, at 376 (“[V]irtually all courts applying the rule of reason require the plaintiff ... to show, at a minimum, that the defendants play a significant role in th[e] [allegedly restrained] market.”).
2.
Gravity has provided allegations of Microsoft’s market power in the relevant software markets, in the form of Microsoft’s shares in these markets.[17] Gravity failed, however, to allege facts regarding Compaq’s or Dell’s market share and concedes that the PC market is “fiercely competitive” and, therefore, that neither Compaq nor Dell has power in the PC market.[18] Gravity, 168 F.Supp.2d at *208 544; see also Digital Equip. Corp. v. Uniq Digital Techs., Inc., 73 F.3d 756, 761 (7th Cir.1996) (Easterbrook, J.) (“Computer manufacturers are vigorous rivals; prices drop daily; this is one of our economy’s most competitive sectors.”). Gravity further concedes that “[t]he only thing that ... distinguishes [Compaq and Dell] from other OEMs is the alacrity with which they acquiesced in accepting [the licensing] agreements to obtain relatively favorable prices from Microsoft for its products.” Gravity, 168 F.Supp.2d at 544. Given Gravity’s concession that the PC market is “fiercely competitive,” and in light of Microsoft’s agreements with other OEMs, Gravity is unable, as a matter of law, to demonstrate that Microsoft’s agreements with Compaq and Dell, when considered individually, are capable of causing any substantial harm to competition. For instance, without having alleged Compaq’s or Dell’s power or share in the PC market, Gravity is unable to demonstrate that rival software firms’ access to Compaq or Dell was an important component of those firms’ potential ability to compete in the software markets, or that Microsoft’s agreements with Compaq and Dell substantially hindered the entrance or operation of these rivals in the software markets or denied them access to a significant number of consumers of software. Similarly, given the failure to allege the market power of Compaq or Dell, Gravity is unable to show that Compaq or Dell has forced, or is likely to be able to force, supracompetitive prices on consumers for undesirable software features. Consequently, assuming that Compaq and Dell each possessed an insignificant portion of the PC market and no ability to control pricing or output in the PC market (as is proper in light of Gravity’s failure to allege market share or any other facts demonstrating market power), the two licensing agreements— considered individually — would be incapable of succeeding in maintaining or leveraging Microsoft’s alleged monopolies, in that neither agreement could substantially reduce the usage share of, or prevent the promotion of, rival browsers, rival operating system software manufacturers, or rival applications software manufacturers.[19] Cf., e.g., Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 52 n. 19, 54, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) (concluding that, although a contractual require *209 ment that distributors sell Sylvania television sets from authorized locations limited competition among the distributors in the resale of Sylvania televisions (“intrabrand competition”), it ultimately promoted competition with other brands of television sets (“interbrand competition”) and stating that the competitiveness of the interbrand market “provides a significant check on the exploitation of intrabrand market power”); Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 13-14, 104 S.Ct. 1561, 80 L.Ed.2d 2 (1984) (“we have condemned tying arrangements when the seller has some special ability — usually called ‘market power’ — to force a purchaser to do something that he would not do in a competitive market”); id. at 16, 104 S.Ct. 1551 (“If only a single purchaser were ‘forced’ with respect to the purchase of a tied item, the resultant impact on competition would not be sufficient to warrant the concern of antitrust law.... [W]e have refused to condemn tying arrangements unless a substantial volume of commerce is foreclosed thereby.”); id. at 37-38, 97 S.Ct. 2549 (O’Connor, J., concurring) (evaluating tie — • ins and noting that to show an adverse impact on consumers, the plaintiff generally must demonstrate two things: market power in the tying — product market and a threat that the seller will acquire market power in the tied — product market); Digital Equip. Corp., 73 F.3d at 761 (Easter-brook, J.) (“Let us ask, then, whether the inclusion of an [operating system] with one’s [PC] — ‘tie-in’ or not — is a means to reduce output and create monopoly profits. Unless the seller has market power, the answer is no .... ”); id. at 762 (“In a competitive market a pig-headed refusal to satisfy customers’ preferences, or an attempt to charge for unwanted items, does not lead to monopoly prices; instead it leads to ruin as rivals step in to take the business.”). Moreover, with respect to the exclusive dealing component of Gravity’s claim, absent an allegation regarding Compaq’s or Dell’s power or share in the PC market, there is no basis in Gravity’s complaint for concluding that either of the two licensing agreements at issue, when considered individually, are likely to foreclose a significant share of the relevant software markets. See Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961) (holding that an exclusive contract does not violate the Clayton Act unless its probable effect is to “foreclose competition in a substantial share of the line of commerce affected”); Microsoft, 253 F.3d at 68-70 (discussing the exclusive dealing aspects of Microsoft’s agreements and concluding that, even when the cumulative effect of Microsoft’s agreements were considered, the agreements did not foreclose enough of the relevant browser market to constitute a § 1 violation).
The district court afforded Gravity ample opportunity to allege facts demonstrating Compaq’s or Dell’s power in the PC market, but Gravity refused, contending for various reasons that Compaq’s and Dell’s power and share in the PC market is immaterial to Compaq’s and Dell’s (separate) ability to influence competition in the relevant software markets.[20] On ap *210 peal, it continues to assert that, as a matter of law, Compaq’s and Dell’s power in the PC market is irrelevant to its § 1 claim because Microsoft’s monopoly power, in a variety of ways, is adequate to demonstrate the likelihood of substantial anti-competitive effects. We address each argument below.
Gravity first argues that Microsoft’s significant market power in the software markets is sufficient to demonstrate anticompetitive effects in those markets without regard to Compaq’s or Dell’s power or share in the PC market. The relevant focus of the § 1 inquiry, however, is the anticompetitive effects of the conspiracy qua conspiracy; therefore, the plaintiff must demonstrate that the conspiratorial agreement itself affected competition in ways that would not have obtained absent the agreement. Spectators’ Communication Network, 253 F.3d at 225 (noting that the issue is “whether the combination or conspiracy, not each individual conspirator, has the [market] power to hurt competition in the relevant market.”); FTC v. Ind. Fed’n of Dentists, 476 U.S. 447, 460, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) (“[T]he purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition.” (emphasis added)). To be sure, one can imagine circumstances in which the allegation of one conspirators’ market power is sufficient to demonstrate a likelihood of anticompetitive effects. For instance, assuming as true Gravity’s allegations regarding Microsoft’s market share in the relevant software markets, had Microsoft agreed to sell its software only to Compaq and Dell, such an agreement would have had the potential to harm competition in software markets, and ultimately in the PC market, irrespective of Compaq’s or Dell’s power or share in the PC market. No such arrangement, however, is alleged here.
Gravity next argues that the district court should have evaluated Microsoft’s “exclusionary conduct both inside and outside the combinations alleged,” and the potential for anticompetitive effects resulting from this conduct in the aggregate. (Appellant’s Br. at 49-50.) The SAC, however, did not allege a conspiracy among Microsoft and all OEMs; it alleged discrete conspiracies between Microsoft and Compaq and Microsoft and Dell. Consequently, the district court correctly determined that it could not consider the cumulative harm of Microsoft’s agreements with all OEMs but instead was required to consider' — individually—Microsoft’s agreements with Compaq and Dell to evaluate each agreement’s potential for anticompet-itive effects.[21]
*211 Likewise, it is untrue that Compaq and Dell, as alleged co-conspirators of Microsoft, are responsible for all of Microsoft’s unilateral acts with other OEMs who were not members of the alleged conspiracies. As noted above, each licensing agreement must be treated as a separate conspiracy, and only acts taken in furtherance of that alleged conspiracy are appropriately considered in determining the adverse effects of the claimed restraints on trade, not acts of one conspirator taken in furtherance of other possible, distinct conspiracies. Cf. United States v. Bonetti, 277 F.3d 441, 447 (4th Cir.2002) (noting, in a criminal conspiracy, that a co-conspirator is hable for “all substantive offenses of his co-conspirator that are both reasonably foreseeable and in furtherance of the conspiracy”); cf. also United States v. Santiago, 906 F.2d 867, 872-73 (2d Cir.1990) (concluding that the single conspiracy test applies to determine whether co-conspirator conduct is reasonably foreseeable and in furtherance of the conspiracy); United States v. Gooden, 892 F.2d 725 (8th Cir.1989) (same). Indeed, to hold otherwise would be to suggest that the distinction between a single conspiracy and multiple conspiracies involving a common defendant is one without a difference.
Thus, we agree with the district court that for Gravity to state a viable § 1 claim, it was required to allege facts which, if proven true, would demonstrate that Compaq’s or Dell’s individual agreements with Microsoft were likely to result in an anti-competitive effect. Without alleging facts demonstrating Compaq’s or Dell’s power or share in the PC market, Gravity was unable to make such a showing.
Similarly, without allegations regarding the market power or share of Compaq or Dell in the PC market, Gravity is unable to show a conspiracy to monopolize under § 2.[22] See 3A Areeda & Hovenkamp ¶ 809, at 370 (“[I]n those instances where power is a prerequisite to holding an agreement to be an unreasonable restraint of trade [under § 1] ... it would make no sense to hold the same agreement offensive to § 2 without proof of power.”). The offense of monopolization requires a showing of “anticompetitive effect.” Microsoft, 253 F.3d at 58. Thus, a viable § 2 conspiracy to monopolize claim must include allegations which, if proven true, would establish that the agreements Com paq and Dell made with Microsoft could have had an anticompetitive effect (when considered separately). See, e.g., id. at 50 (discussing the meaning of “monopolization” within § 2); U.S. Anchor Mfg., Inc. v. Rule Industries, Inc., 7 F.3d 986, 1001 (11th Cir.1993) (listing the likelihood of an anticompetitive effect as one of the elements of a conspiracy to monopolize under § 2); Seagood Trading Corp. v. Jerrico, Inc., 924 F.2d 1555, 1576 (11th Cir.1991) (“[A] section 1 claim and a section 2 conspiracy to monopolize claim require the same threshold showing-the existence of an agreement to restrain trade.”). Accordingly, for the reasons set forth above regarding the inadequacies in Gravity’s § 1 allegations, Gravity’s § 2 claim also fails as a matter of law.
Gravity suggests that these conclusions are irreconcilably at odds with the D.C. Circuit’s conclusions in the public enforcement action, contending that the D.C. Circuit implicitly recognized that Microsoft’s *212 licensing agreements with Compaq and Dell violated § 1. This contention, however, misapprehends the nature of the D.C. Circuit’s holding. Notably, the district court in the public enforcement action held that the exclusive dealing arrangements in Microsoft’s licensing agreements, including its agreement with Compaq, did not violate § 1 under the rule of reason, concluding “that Microsoft’s arrangements with various firms did not foreclose enough of the relevant market to constitute a § 1 violation.” United States v. Microsoft, 87 F.Supp.2d 30, 53 (D.D.C.2000). The only § 1 violation found by the district court was based upon Microsoft’s alleged tying of Windows and IE, and the D.C. Circuit vacated that ruling. Microsoft, 253 F.3d at 84-95, Moreover, in conducting its § 2 analysis, the D.C. Circuit evaluated the anticompetitive effects of Microsoft’s licensing agreements with all OEMs. Of course, as is set forth above, the analysis of anticompetitive effects depends on the identification of the defendants’ “significant role” within the relevant market — an inquiry that is much different when examining the cumulative harm of Microsoft’s conduct than it is when examining the effects of Microsoft’s individual agreements with two OEMs for which Gravity declines to provide information regarding market share or power. Thus, nothing in the public enforcement action suggests that Gravity’s § 1 and § 2 claims are viable.
We recognize that “summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles,” Poller v. Columbia Broadcasting Sys., 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), and that an antitrust complaint should not be dismissed at the Rule 12(b)(6) stage “merely because the court doubts the plaintiff will ultimately prevail,” Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp., 910 F.2d 139, 145 n. 8 (4th Cir.1990) (internal quotation marks omitted). Nevertheless, to avoid dismissal for failure to state a claim, the plaintiff must “colorably state[ ] facts which, if proven, would entitle him to relief.” Id. (internal quotation marks omitted). We consistently have held this to require an allegation of facts supportive of each element of the plaintiffs antitrust claim. Estate Constr. Co., 14 F.3d at 220 (holding that “notice pleading” requires “allegations covering all the elements that comprise the theory for relief’ (internal quotation marks omitted); Mun. Utils. Bd. of Albertville, 934 F.2d at 1501 (“A plaintiff must plead sufficient facts so that each element of the alleged antitrust violation can be identified.”)). “A contrary view would be tantamount to providing antitrust litigation with an exemption from Rule 12(b)(6).” Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106-07 (7th Cir.1984).
Although Gravity alleges that Microsoft’s agreements with Compaq and Dell individually produced anticompetitive effects, it does not provide any factual basis to support this allegation.[23] Moreover, Gravity has made clear that it has no intention of providing evidence regarding the market power or share of Compaq or Dell; thus, it does not seek additional discovery or factual development with respect to the issue of market share or power. Instead, it asks us to accept its conclusory assertion that Microsoft’s agreements with Compaq and Dell, when considered individually, created a likelihood of significant anticompetitive effects in the relevant soft *213 ware markets without regard to Compaq’s or Dell’s market power or share in the PC market. This we cannot do. “The pleader may not evade [Rule 12(b)(6)] requirements by merely alleging a bare legal conclusion; if the facts do not at least outline or adumbrate a violation of the Sherman Act, the plaintiffs will get nowhere merely by dressing them up in the language of antitrust.” Car Carriers, Inc., 745 F.2d at 1106 (internal quotation marks omitted). Because Gravity has failed to allege facts which, if true, would establish that the two licensing agreements at issue are unreasonable restraints on trade that caused antitrust injury to consumers, its § 1 and § 2 claims fail as a matter of law. Cf. Dunn & Mavis, Inc. v. Nu-Car Driveaway, Inc., 691 F.2d 241, 245 (6th Cir.1982) (“Since the complaint does not allege facts suggesting that [the manufacturer’s] refusal to deal had any significant anticompeti-tive effect on the market, there is no rule of reason case alleged.”).
This court recently concluded that the Supreme Court’s holding in Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), did not alter the basic pleading requirement that a plaintiff set forth facts sufficient to allege each element of his claim. See Iodice v. United States, 289 F.3d 270, 281 (4th Cir.2002) (“Even in these days of notice pleadings a complaint asserting a negligence claim must disclose that each of the elements is present in order to be sufficient.” (internal citations and quotation marks omitted)); see also Swierkiewicz, 122 S.Ct. at 997 (relying upon a distinction between “evi-dentiary standards” and “pleading requirement[s]”). As the dissent recognizes, a sufficient allegation of anticompetitive effects is dependent upon Compaq’s and Dell’s respective abilities to affect competition in the PC market. Post at 35 (“[I]f the conspiracy included only minor OEMs, then the conspiracy would presumably have no power to cause significant anti-competitive effects.”). Consequently, by failing to allege Compaq’s and Dell’s market share or power, Gravity has failed to set forth factual allegations necessary to support the basic elements of its § 1 and § 2 claims. See McLain v. Real Estate Bd. of New Orleans, 444 U.S. 232, 243, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980) (noting that to establish liability under the Sherman Act, a showing of either an anticom-petitive effect or an anticompetitive purpose is necessary).
IV. Illinois Brick
Even if we agreed with Gravity that it has alleged sufficient claims under § 1 and § 2 for purposes of Rule 12(b)(6), we would affirm the district court’s conclusion that Gravity is barred from seeking compensatory damages relief under the indirect purchaser rule of Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).[24] A brief review of the evolution of the indirect purchaser rule is helpful to understand its application to Gravity’s claims. In Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), the defendant in a Sherman Act suit, a manufacturer of machinery for making shoes, defended on the ground that the plaintiff, a shoe manufacturer that had bought the defendant’s machinery, had passed on any monopoly overcharge to its own customers, the wholesale purchasers *214 of its shoes, and hence had not been injured. The Supreme Court held that an antitrust defendant would not be permitted to defend against a damages suit on the ground that the plaintiff had shifted the cost of the defendant’s wrongdoing to the plaintiffs customers. The Court explained the rationale for its decision as follows:
Even if it could be shown that the buyer raised his price in response to, and in the amount of, the overcharge and that his margin of profit and total sales had not thereafter declined, there would remain the nearly insuperable difficulty of demonstrating that the particular plaintiff could not or would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued. Since establishing the applicability of the passing — on defense would require a convincing showing of each of these virtually unascertainable figures, the task would normally prove insurmountable.
Id. at 493, 88 S.Ct. 2224. The Hanover Shoe Court further explained that the plaintiffs customers “would have only a tiny stake” in enforcing the anti-trust law. Id. at 494, 88 S.Ct. 2224.
In Illinois Brick, plaintiffs, who were indirect purchasers of concrete blocks, sought to recover damages on the theory that masonry contractors, who incorporated concrete blocks purchased from defendants into walls and other masonry structures, passed on the alleged overcharge for the blocks to general contractors, who incorporated the masonry structures into entire buildings, and that the general contractors in turn passed on the overcharge to plaintiffs in the bids submitted for those buildings. Illinois Brick, 431 U.S. at 726-27, 97 S.Ct. 2061. The Court extended the Hanover Shoe rule and held that only direct purchasers from an antitrust violator can sue for damages, providing two rationales for the rule: it avoids the danger of multiple, “overlapping recoveries” against the original seller by direct and indirect purchasers, and it avoids the “evidentiary complexities and uncertainties” in determining the amount of any overcharge passed through the intermediary to the indirect purchaser. Id. at 730-33, 97 S.Ct. 2061. The Supreme Court expressly contemplated two exceptions to the indirect purchaser rule: (1) where the indirect purchaser acquired goods through a preexisting cost-plus contract and (2) “where the direct purchaser is owned or controlled by its customer.” Id. at 736 & n. 16. Illinois Brick left unclear whether there might be exceptions for eases in which the amount of the overcharge that was passed on to a lower tier of purchasers could be determined simply and with mechanical precision, but thereafter, the Supreme Court held that even where the amount of overcharge passed on is clear, allowing indirect purchasers to pursue damages claims would be inconsistent with Illinois Brick, and the Court refused to create any new exception. Kansas v. UtiliCorp United, Inc., 497 U.S. 199, 208, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990). Moreover, in UtiliCorp United, the Supreme Court cautioned lower federal courts against creating new exceptions to the Illinois Brick rule. Id. at 216, 110 S.Ct. 2807 (“The rationales underlying Hanover Shoe and Illinois Brick will not apply with equal force in all cases. We nonetheless believe ample justification exists for our stated decision not to carve out exceptions to the direct purchaser rule.” (internal quotation marks omitted)).
Despite this admonition, several courts have recognized a “co-conspirator exception” to Illinois Brick. See, e.g., Paper Sys. Inc. v. Nippon Paper Indus., 281 F.3d 629, 631-32 (7th Cir.2002); Lowell v. American Cyanamid Co., 177 F.3d 1228, *215 1231 (11th Cir.1999); Campos v. Ticketmaster Corp., 140 F.3d 1166, 1171 (8th Cir.1998); In re Brand Name Prescription Drugs, 123 F.3d at 604-05; Arizona v. Shamrock Foods Co., 729 F.2d 1208, 1211 (9th Cir.1984). Gravity asserts that these cases stand for the proposition that Illinois Brick is inapplicable when any conspiracy has been alleged, but we interpret these cases as standing for the more narrow proposition that Illinois Brick is inapplicable to a particular type of conspiracy — price-fixing conspiracies. Cf. McCarthy v. Recordex Serv., Inc., 80 F.3d 842, 854-55 (3d Cir.1996) (refusing to adopt a co-conspirator exception where plaintiffs have not alleged that the intermediaries immediately upstream colluded to overcharge). Were we to adopt Gravity’s broader interpretation, the Illinois Brick rule would be inverted solely based upon artful pleading. Such a result is contrary to Illinois Brick itself as well as the Supreme Court’s clear directive in UtiliCorp United against crafting new exceptions to the Illinois Brick rule. Far more reasonable is the proposition that, to the extent a court were to recognize a co-conspirator exception to Illinois Brick, such an exception would be grounded on the damages theory underlying the alleged conspiracy. For example, the rationale for concluding that Illinois Brick does not apply to a price-fixing conspiracy is that no overcharge has been passed on to the consumer: When a dealer has illegally conspired with a manufacturer with respect to the price paid by a consumer, then “the consumer is the only party who has paid any overcharge.” 2 Areeda & Hovenkamp ¶ 371h, at 264. We need not resolve whether we would recognize a co-conspirator exception to Illinois Brick’s indirect purchaser rule for a price-fixing conspiracy because no such conspiracy has been alleged here. Instead, Gravity’s compensatory damages claim is premised on an attempt to recover for Microsoft’s illegal overcharge that allegedly was passed on to Gravity. Accordingly, Gravity’s claim is materially indistinguishable from the claim under consideration in Illinois Brick, and its inclusion of a conspiracy allegation is insufficient to circumvent the Illinois Brick rule.
Nevertheless, Gravity argues that Illinois Brick ought not to control because the policy concerns underlying Illinois Brick are not implicated here. First, Gravity contends that there is no danger of duplicative recovery because the OEMs “apparently have elected not to sue Microsoft.” (Appellant’s Br. at 69.) The Supreme Court in Illinois Brick, however, “recognize[d] that direct purchasers sometimes may refrain from bringing a treble— damages suit for fear of disrupting relations with their suppliers.” Illinois Brick, 431 U.S. at 746, 97 S.Ct. 2061. Yet, the majority concluded that “on balance ... the legislative purpose in creating a group of private attorneys general to enforce anti-trust laws ... is better served by holding direct purchasers to be injured to the full extent of the overcharge paid by them than by attempting to apportion the overcharge among all that may have absorbed part of it.” Id. (internal quotation marks omitted).
Gravity also argues that its claims do not require the complex task of price-tracing because the consumers’ damages are the difference between the “but-for” price that they would have paid for the Windows software absent the illegal conspiracy and the amount they actually paid for it. This argument misses the point, in that to calculate the “but-for” price, the court would be required to determine the over-charge, if any, for Microsoft’s software that was passed on to consumers — the exact analysis that Illinois Brick forbids.
*216 Finally, Gravity suggests that, to the extent there is any difficulty in apportioning damages, the court could avoid this difficulty by awarding 100% of the overcharge to the consumer. Gravity does not explain, however, why consumers should be awarded a windfall. At bottom, Gravity’s policy arguments are virtually identical to those raised by Justice Brennan in his Illinois Brick dissent. Id. at 748-65, 97 S.Ct. 2061 (Brennan, J., dissenting). Of course, they were considered and rejected by the majority in formulating the indirect purchaser rule, and we are not at liberty to reevaluate those policy choices here. Accordingly, we conclude that Illinois Brick bars Gravity’s claims for compensatory damages for the alleged § 1 and § 2 violations.
V.
We conclude that Gravity’s § 1 and § 2 claims fail as a matter of law and that, in any event, Illinois Brick bars Gravity’s ability to recover compensatory damages. Thus, we affirm the judgment of the district court.

AFFIRMED.

.The Supreme Court defines monopoly power as "the power to control prices or exclude competition.” United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264(1956). "More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level.” United States v. Microsoft Corp., 253 F.3d 34, 51 (D.C.Cir.2001) (citing 2A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 501, at 85 (1995)). As the D.C. Circuit noted, "merely possessing monopoly power is not itself an antitrust violation,” but “it is a necessary element of a [Section 2] monopolization charge.” Id.

. Operating systems function as platforms for software applications, such as word processing and spreadsheet programs.

. Gravity also asserted a class action claim against Microsoft individually for monopolization of case management and litigation support software, but Gravity has voluntarily dismissed this claim with prejudice.

. Per-processor license fees are royalties that Microsoft requires the OEM Defendants to pay for personal computers that are sold pursuant to the licensing agreement containing a "particular microprocessor type.” United States v. Microsoft Corp, 1995 WL 505998, at *2 (D.D.C. Aug.21, 1995).

. Netscape Navigator and the Java programming language are examples of middleware products written for multiple operating systems.

. For a discussion of the distinction between a "hub-and-spoke” conspiracy and separate vertical conspiracies, see infra at 202-03.

. Gravity did not allege a separate conspiracy between Microsoft and PB in the SAC because none of the named plaintiffs purchased a PC from PB. (Appellant’s Br. at 20 n. 5.)

. Although Gravity's complaint was filed pri- or to resolution of the public enforcement action, the factual predicate is similar, and on appeal, Gravity relies upon many of the D.C. Circuit’s findings for general support for its propositions.

. For example, the licensing agreements prohibited OEMs from causing any user interface other than the Windows desktop to launch automatically and from adding icons or folders different in size or shape from those sup- ■ plied by Microsoft.

.For a detailed discussion of the relationship between the browser and the operating systems markets and the anticompetitive effect of the license restrictions on the OEMs’ ability to promote rival browsers, see Microsoft, 253 F.3d at 59-64.

. Section 1 states: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.” 15 U.S.C.A. § 1 (West 1997).

. A single criminal conspiracy generally is demonstrated by an "overlap of key actors, methods, and goals.” United States v. Strickland, 245 F.3d 368, 385 (4th Cir.2001) (internal quotation marks and citations omitted); see also United States v. Bowens, 224 F.3d 302, 308 (4th Cir.2000) (holding that it was not error for the district court to refuse to instruct the jury on multiple conspiracies where there was evidence of common methods of operation and common participants linked by a mutual interest); United States v. Squillacote, 221 F.3d 542, 574 (4th Cir.2000) (“A single conspiracy exists where there is one overall agreement, or one general business venture.” (internal quotation marks omitted)). Because Gravity does not argue that its allegations are sufficient to demonstrate this type of overlap but instead only advocates our adopting the concept of a rimless wheel conspiracy, we need not decide whether the same test that applies to demonstrate a single criminal conspiracy would apply in the context of the Sherman Act.

. The dissent's confusion in applying Kottea-kos is understandable by reference to its reliance on the Sixth and Eighth Circuits, both of which appear to have misinterpreted Kotteakos. Post at 216-17 (citing Elder-Beerman Stores Corp. v. Federated Dep't Stores, Inc., 459 F.2d 138 (6th Cir.1972); Impro Prods., Inc. v. Herrick, 715 F.2d 1267, 1279 (8th Cir.1983)). In Elder-Beerman, the Sixth Circuit stated (hat "[t]here is much discussion in the Kotteakos decision indicating the possibility that such a 'rimless wheel' theory might be used in a civil case though not appropriate in a criminal case.” Elder-Beerman, 459 F.2d at 147. In Impro Products, the Eighth Circuit compounded the Sixth Circuit's error by describing the test set forth in Elder-Beerman for a rimless wheel conspiracy (which is adopted by the dissent, post at 216-17) and then concluding that a rimless wheel conspiracy constitutes a single conspiracy in civil actions. Impro Prods., 715 F.2d at 1279 & n. 14. Nothing in Kotteakos suggests, however, that the definition of a rimless wheel conspiracy turns on whether the conspiracy is civil or criminal in nature; the Sixth and the Eighth Circuits’ contrary belief apparently stems from the distinction between criminal and civil actions that was drawn in Kotteakos for purposes of analyzing harmless error.
In any event, even if we were to further distort the clear holding set forth in Kotteakos by following the Sixth and Eighth Circuits in the manner suggested by the dissent, our resolution of Gravity's claims would be unaffected. Regardless of whether Gravity has alleged a single conspiracy among the OEM Defendants and Microsoft or two separate agreements, its § 1 and § 2 claims would be subject to dismissal for failure to allege facts demonstrating a significant likelihood of anti-competitive effects.

. Arguably, however, these allegations are insufficient as a matter of law to demonstrate that either Compaq or Dell possessed specific intent to maintain Microsoft's alleged monopolies under § 2. See TV Communications Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1026-27 (10th Cir.1992) ("Because the cable operators would have no rational motive to create [a monopolistic environment], TVCN's allegations do not provide an inference of specific intent to conspire to achieve the stated goal of the conspiracy.”).

. Justice Brandeis in Bd. of Trade of City of Chicago v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918), explained the rule of reason as follows:
The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition *206 before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.
Id. at 238, 38 S.Ct. 242.

. Nor do we suggest whether any such anti-competitive effect, if shown to be likely and substantial in magnitude, would be outweighed by a pro-competitive justification. See, e.g., Microsoft, 253 F.3d at 59 (noting, under traditional rule of reason analysis, if the plaintiff successfully demonstrates anti-competitive effect, then the burden shifts to the defendant to proffer a procompetitive justification for its conduct). •

. Gravity alleged that Microsoft "maintained a monopoly share (in the range of 90%) in the personal computer operating software market” throughout the "class periods,” (J.A. at 473), and maintained a market share in the range of 80-90% in the word processing and spreadsheet software markets throughout the class period. For antitrust purposes, market power "is the power to force a purchaser to do something that he would not do in a competitive market.” Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 464, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (internal quotation marks omitted). "It has been defined as the ability of a single seller to raise price and restrict output.” Id. (internal quotation marks omitted). Market share is defined as "[t]he percentage of a market that is controlled by a firm.” Black's Law Dictionary 971 (6th ed. 1991). Market power generally is identified, in part, by examining market share. See, e.g., Andrew Chin, Note, Antitrust by Chance: A Unified Theory of Horizontal Merger Doctrine, 106 Yale L.J. 1165, 1169-72 (1997) (discussing movement away from strict reliance on calculation of market share in antitrust analysis). For purposes of Rule 12(b)(6), we consider Gravity's allegations regarding Microsoft’s market share sufficient to allege Microsoft's power in the relevant software markets.

.Gravity contends that because the relevant markets are in software, there is no need to evaluate Compaq's or Dell's power in the PC market. Compaq’s and Dell's power in the PC market is critical in the analysis, however, because both OEMs pre-install Microsoft's software on their PCs; neither operates inde *208 pendently in the software market. Thus, Compaq’s and Dell's ability to influence competition in the relevant software markets through their separate agreements with Microsoft is dependent on their ability to influence competition in the PC market. Cf. Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 18, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) ("[A]ny inquiry into the validity of a tying arrangement must focus on the market or markets in which the two products are sold, for that is where the anticompetitive forcing has its impact.”).

. Gravity asserts that it need not show that Microsoft's agreements with Compaq and Dell were each a sole cause of any anticom-petitive effects but need show only that tire agreements were each a "material cause" of anticompetitive effects. See Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) ("It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under § 4.”). Without an allegation of market share or market power of either Compaq or Dell, however, Gravity cannot make the latter showing. Cf. Brunswick Corp. v. Pueblo Bowl-O-Mat, 429 U.S. 477, 487-88, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (holding that an antitrust claim fails as a matter of law when the plaintiff would have suffered the identical loss without regard to the claimed anticompetitive conduct); 2 Areeda & Hovenkamp ¶ 363a-b, at 219-23 (noting that no material cause can be demonstrated where an independent cause •fully accounts for the claimed antitrust injury).

. Gravity did allege that Compaq and Dell were the "largest PC makers” and were "among the largest distributors of Microsoft’s products.” (Appellant’s Br. at 11.) The dissent relies on this as a sufficient allegation of Compaq and Dell's respective influences in the PC market. Post at 218. Being the "largest” in a relevant market, however, says nothing of a firm's ability to affect competition in that market. For example, Compaq and Dell each may possess only five percent of the market share, whereas many other OEMs each possess four percent of the market share, in which case, despite being the largest PC makers and software distributors, neither Compaq nor Dell would have the ability, *210 through their separate conspiracies with Microsoft, to affect competition in the relevant software markets. Cf., e.g., Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 26 & n. 43, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) (holding, as a matter of law, that thirty percent share of the relevant market is insufficient to confer market power). Accordingly, Gravity’s allegations that Compaq and Dell were the largest PC makers and software distributors provide no basis whatsoever to conclude that either had sufficient share of the PC market to affect competition in the relevant software markets.

. The cumulative harm of Microsoft's actions ''outside” the two licensing agreements at issue has been subject to review in the public enforcement action and will be further subject to review in the consumer class actions brought against Microsoft individually and in any suits brought by OEMs against Microsoft. As noted above, supra at 209-10, the focus of this § 1 inquiry is not Microsoft's actions standing alone, but the extent to which its concerted actions with each of the two individual OEMs promoted Microsoft's *211 monopoly power or otherwise restrained trade.

. Section 2 states:
Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nationals, shall be deemed guilty of a felony....
15 U.S.C.A. § 2 (West 1997).

. While the dissent notes as '‘unexceptional” the proposition that a plaintiff may not rely on a bare legal conclusion to avoid dismissal under Rule 12(b)(6), it proceeds to rely solely on Gravity's bare legal conclusions to find its complaint sufficient. Post at 221 n. 1.

. Illinois Brick’s indirect purchaser rule, when applicable, bars only compensatory damages relief and does not apply to injunctive relief. See Cargill, Inc. v. Monfort of Colorado, 479 U.S. 104, 111 n. 6, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986); Campos v. Ticketmaster, 140 F.3d 1166, 1172 (8th Cir.1998); McCarthy v. Recordex Serv., Inc., 80 F.3d 842, 856-57 (3d Cir.1996).