**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ALBERT ROBERTSON; FRANCES
ROBERTSON; WILLIAM J. GARRITY;
GARRITY VENTURES, LLC, on
behalf of themselves and all others
similarly situated,

*Plaintiffs-Appellees,*

v.

SEA PINES REAL ESTATE COMPANIES,
INCORPORATED, a/k/a The Sea Pines
Real Estate Company; COASTAL
HOMES AND LAND, INCORPORATED,
a/k/a Coastal Homes & Land
Realty; COLLINS GROUP REALTY,
INCORPORATED; ENGARD RENTAL
COMPANY, LLC, a/k/a Engard Real
Estate Company; BRUCE A. GOFF,
INCORPORATED; DAUFUSKIE ISLAND
RESORT REALTY, LLC; SEARCHLIGHT
REALTY, INCORPORATED, a/k/a
Searchlight Realty; GATEWAY
REALTY, LLC; HILTON HEAD
LUXURY PROPERTIES, INCORPORATED,
a/k/a Prudential Premier Island
Properties;

No. 11-1538

CHARTER 1 REALTY & MARKETING;
THE WILLIAM HILTON COMPANY,
a/k/a William F. Hilton Realty;
EG ROBINSON III AND ASSOCIATES
REALTORS, INCORPORATED, a/k/a EG
Robinson Real Estate; GINA SCOTT
REALTY; JULIE TOON PAWLEY REAL
ESTATE BROKER, INCORPORATED;
CRG PROPERTIES, INCORPORATED,
a/k/a Carolina Realty Group,
Incorporated,

*Defendants-Appellants,*

and

LANCASTER RESORT RENTALS AND
SALES, INCORPORATED; INGRAM
THOMPSON & ASSOCIATES,
INCORPORATED,

*Defendants.*

UNITED STATES OF AMERICA,

*Amicus Supporting Appellees.*

THOMAS BOLAND, on behalf of himself and others similarly situated,

*Plaintiff-Appellee,*

v.

CONSOLIDATED MULTIPLE LISTINGS SERVICE, INCORPORATED; THE MUNGO COMPANY, INCORPORATED; SANDION, d/b/a Coldwell Banker United, Realtors, a Texas general partnership; BOLLIN LIGON WALKER REALTORS, PA; RUSSELL & JEFFCOAT REALTORS, INCORPORATED; LDG, INCORPORATED, d/b/a RE-MAX Metro Associates; DTBCR HOLDINGS, INCORPORATED, f/k/a Bob Capes Realty, Incorporated; THE ADVANTAGE GROUP, INCORPORATED; LANDMARK RESOURCES LLC,

*Defendants-Appellants,*

and

JOHN DOES, 1-8,

*Defendant.*

No. 11-1539

UNITED STATES OF AMERICA,

*Amicus Supporting Appellee.*

ALBERT ROBERTSON; FRANCES
ROBERTSON; WILLIAM J. GARRITY;
GARRITY VENTURES, LLC, on
behalf of themselves and all others
similarly situated,

*Plaintiffs-Appellants,*

v.

SEA PINES REAL ESTATE COMPANIES,
INCORPORATED, a/k/a The Sea Pines
Real Estate Company; COASTAL
HOMES AND LAND, INCORPORATED,
a/k/a Coastal Homes & Land
Realty; COLLINS GROUP REALTY,
INCORPORATED; ENGARD RENTAL
COMPANY, LLC, a/k/a Engard Real
Estate Company; BRUCE A. GOFF,
INCORPORATED; DAUFUSKIE ISLAND
RESORT REALTY, LLC; SEARCHLIGHT
REALTY, INCORPORATED, a/k/a
Searchlight Realty; GATEWAY
REALTY, LLC; HILTON HEAD
LUXURY PROPERTIES, INCORPORATED,
a/k/a Prudential Premier Island
Properties; CHARTER 1 REALTY &
MARKETING; THE WILLIAM HILTON
COMPANY, a/k/a William F. Hilton
Realty; EG ROBINSON III AND
ASSOCIATES REALTORS,
INCORPORATED, a/k/a EG Robinson
Real Estate; GINA SCOTT REALTY;

No. 11-1540

LANCASTER RESORT RENTALS AND
SALES, INCORPORATED, a/k/a
Lancaster Resort Sales; INGRAM
THOMPSON & ASSOCIATES,
INCORPORATED; JULIE TOON PAWLEY
REAL ESTATE BROKER,
INCORPORATED; CRG PROPERTIES,
INCORPORATED, a/k/a Carolina
Realty Group, Incorporated,

*Defendants-Appellees.*

UNITED STATES OF AMERICA,

*Amicus Supporting Appellants.*

THOMAS BOLAND, on behalf of
himself and others similarly
situated,

*Plaintiff-Appellant,*

v.

CONSOLIDATED MULTIPLE LISTINGS
SERVICE, INCORPORATED; LANDMARK
RESOURCES LLC; THE MUNGO
COMPANY, INCORPORATED; LDG,
INCORPORATED, a/k/a RE-MAX
Metro Associates; DTBCR
HOLDINGS, INCORPORATED, f/k/a Bob
Capes Realty, Incorporated;

No. 11-1541

SANDION, d/b/a Coldwell Bankers
United Realtors, a Texas general
partnership; THE ADVANTAGE
GROUP, INCORPORATED; BOLLIN
LIGON WALKER REALTORS, PA;
RUSSELL & JEFFCOAT REALTORS,
INCORPORATED,

    *Defendants-Appellees.*

UNITED STATES OF AMERICA,

  *Amicus Supporting Appellant.*

Appeals from the United States District Court
for the District of South Carolina,
at Beaufort and Columbia.
Sol Blatt, Jr., Senior District Judge.
(9:10-cv-00095-SB; 3:09-cv-01335-SB; 9:10-cv-00095-SB;
3:09-cv-01335-SB)

Argued: March 20, 2012

Decided: May 14, 2012

Before WILKINSON, KING, and AGEE, Circuit Judges.

Affirmed and remanded by published opinion. Judge Wilkinson wrote the opinion, in which Judge King and Judge Agee joined.

**COUNSEL**

**ARGUED:** Celeste T. Jones, MCNAIR LAW FIRM, PA, Columbia, South Carolina; Harry Augustus Swagart, III, Columbia, South Carolina, for Appellants/Cross-Appellees. Garrett D. Blanchfield, Jr., REINHARDT WENDORF & BLANCHFIELD, St. Paul, Minnesota; Brian Douglas Penny, GOLDMAN, SCARLATO, KARON & PENNY, PC, Wayne, Pennsylvania, for Appellees/Cross-Appellants. Nickolai Gilford Levin, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae. **ON BRIEF:** Jane W. Trinkley, MCNAIR LAW FIRM, PA, Columbia, South Carolina, for Appellants/Cross-Appellees in No. 11-1538 and No. 11-1540; Edward M. Woodward, Jr., WOODWARD, COTHRAN & HERNDON, Columbia, South Carolina, Frederick A. Gertz, GERTZ & MOORE, Columbia, South Carolina, Mason A. Summers, David A. Anderson, RICHARDSON PLOWDEN & ROBINSON, Columbia, South Carolina for Appellants/Cross-Appellees in No. 11-1539 and No. 11-1541. Jesse A. Kirchner, Matthew E. Yelverton, THURMOND KIRCHNER TIMBES & YELVERTON, PA, Charleston, South Carolina; S. Randall Hood, Chad McGowan, MCGOWAN, HOOD & FELDER, LLC, Rock Hill, South Carolina; John G. Felder, Jr., MCGOWAN, HOOD & FELDER, LLC, Columbia, South Carolina; Daniel R. Karon, GOLDMAN SCARLATO & KARON, PC, Cleveland, Ohio; Grant A. Goodman, GOODMAN LAW FIRM, Cleveland, Ohio; Mark Reinhardt, REINHARDT WENDORF & BLANCHFIELD, St. Paul, Minnesota, for Appellees/Cross-Appellants. Sharis A. Pozen, Acting Assistant Attorney General, Catherine G. O'Sullivan, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae.

**OPINION**

WILKINSON, Circuit Judge:

This case involves two putative class actions, consolidated on interlocutory appeal, brought by purchasers of real estate brokerage services in South Carolina. Each complaint alleges that the real estate brokerages serving as board members of the local multiple listing service conspired to unfairly restrain market competition in violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. The district court denied the defendants' motions to dismiss the complaints. We affirm and remand for further proceedings.

I.

The two complaints at issue concern allegedly anticompetitive by-laws passed by board members of two different multiple listing services in South Carolina. A multiple listing service ("MLS") is an incorporated joint venture that, among other things, maintains a database of properties listed for sale in the MLS service area, which its member brokerages use to post and find property listings. An MLS centralizes information within the real estate market it serves, enabling MLS members to communicate with each other to coordinate the sale and purchase of real estate. Particularly in an area served by only one MLS, access to MLS resources may be critical for a brokerage to successfully participate in the relevant real estate market.

The complaints contain nearly identical allegations. In the first complaint ("the Robertson complaint"), plaintiffs identify the putative class as purchasers of real estate brokerage services listed by the defendants on the Multiple Listing Service of Hilton Head Island, Inc. ("HHMLS"). Similarly, in the second complaint ("the Boland complaint"), plaintiffs identify the putative class as purchasers of real estate brokerage services listed by the defendants on the Columbia Consolidated

Multiple Listing Service, Inc. ("CMLS"). The Robertson and Boland defendants are identified as licensed real estate brokerages that served, via their employees, on HHMLS's and CMLS's board of trustees, respectively.

The complaints allege that while serving on the relevant MLS boards of trustees, defendants conspired to restrain competition in their respective real estate markets in violation of § 1 of the Sherman Antitrust Act. According to the complaints, defendants used the MLS "as a conduit" to "create[ ] rules that govern [MLS] members' conduct and business practices," which "inhibit[ed] competition" and "illegally stabilized the prices" paid by plaintiffs as customers of real estate brokerage services. Specifically, the complaints allege that the rules passed by the defendants were designed to exclude innovative, lower-priced competitors and thus insulate the defendants from competitive pressures posed by brokerages that offered a larger menu of service choices and alternative pricing to their customers.

For example, the defendants allegedly prevented members from providing anything less than "the full array of services that brokerages traditionally have provided" and prohibited members from allowing a property seller the option of "avoiding paying the broker a commission if the seller finds the buyer on his or her own." Both complaints allege that defendants prescribed "subjective standards for admission to membership that allow [MLS] representatives to deny membership to brokerages who they might expect to compete more aggressively or in more innovative ways than [MLS] members, including defendants, would prefer." According to the complaints, the defendants aimed to exclude lower-priced internet-based brokerages from the MLS by requiring, among other things, that member brokerages maintain a physical office in the MLS service area.

The defendants in each case moved to dismiss the complaints under Rule 12(b)(6) for failure to state a plausible

claim for relief. Among other things, the Robertson and Boland defendants argued that the Sherman Act claims warranted dismissal under the intracorporate immunity doctrine for failure to allege an agreement between two or more separate legal entities. The district court denied the motions to dismiss, finding that the complaints alleged an anticompetitive conspiracy sufficient to state a plausible claim for relief under § 1. Relying on *American Needle, Inc. v. National Football League*, 130 S. Ct. 2201 (2010), the trial court found that the claims were not barred by the intracorporate immunity doctrine because "the alleged conspiracy joins independent centers of decisionmaking that are capable of conspiring under section 1."

The district court certified its order for interlocutory review under 28 U.S.C. § 1292(b) and this court granted defendants' petition for permission to appeal. Appellants renew their objections to the sufficiency of the Robertson and Boland complaints and we shall address their claims in turn. We review *de novo* the district court's denial of the Rule 12(b)(6) motions to dismiss. *See Anita's N.M. Style Mexican Food, Inc. v. Anita's Mexican Foods Corp.*, 201 F.3d 314, 319 (4th Cir. 2000). Like the district court, we must take the complaints' factual allegations as true and draw all reasonable inferences in plaintiffs' favor. *See E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 440 (4th Cir. 2011).

## II.

Section one of the Sherman Antitrust Act prohibits "[e]very contract, combination . . ., or conspiracy, in restraint of trade." 15 U.S.C. § 1. To establish a § 1 antitrust violation, a plaintiff must prove, and therefore plead, "(1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002).

At this stage of the litigation, our task is limited. We are not asked to consider whether defendants actually violated § 1,

but to determine whether the complaints state "a plausible claim for relief [to] survive[ ] a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). We must first inquire therefore whether these pleadings state a § 1 claim against defendants for their decisionmaking as MLS board members -– to wit, whether defendants constituted separate economic actors capable of conspiring for purposes of § 1. *See Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 699 (4th Cir. 1991) (en banc). Appellants contend that plaintiffs failed to allege the plurality of legal entities necessary for a Sherman Act violation. They argue that the individual brokerages acted only in their capacities as MLS board members and that everything that may have happened here reflects nothing more than the independent actions of a single corporate entity, namely the MLS itself.

For the reasons that follow, we disagree.

## A.

The Sherman Antitrust Act "was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958). Section two of the Sherman Antitrust Act proscribes both concerted and independent actions that monopolize trade. *See* 15 U.S.C. § 2. But section one's prohibition against restraint of trade applies "only to concerted action," *American Needle*, 130 S. Ct. at 2208, which "requires evidence of a relationship between at least two legally distinct persons or entities," *Oksanen*, 945 F.2d at 702. Concerted activity is of special concern because it "inherently is fraught with anticompetitive risk" and "deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768-69 (1984).

Two Supreme Court cases, *Copperweld* and *American Needle*, have set forth the criteria for concerted action and guide

our analysis of defendants' conduct. *Copperweld* held that "officers or employees of the same firm do not provide the plurality of actors imperative for a § 1 conspiracy" as "internal 'agreement' to implement a single, unitary firm's policies does not raise the antitrust dangers that § 1 was designed to police." 467 U.S. at 769. In *American Needle*, the Court applied *Copperweld* to the conduct of members of an incorporated joint venture. Specifically, the Court recognized that "[a]greements made within a firm can constitute concerted action covered by § 1 when the parties to the agreement act on interests separate from those of the firm itself, and the intrafirm agreements may simply be a formalistic shell for ongoing concerted action." 130 S. Ct. at 2215 (footnote omitted).

The *American Needle* Court explained that "concerted action under § 1 does not turn simply on whether the parties involved are legally distinct entities." *Id.* at 2209. Rather, "substance, not form, should determine whether a[n] . . . entity is capable of conspiring under § 1." *Id.* at 2211 (quoting *Copperweld*, 467 U.S. at 773 n.21). It is thus not dispositive if defendants organize themselves "under a single umbrella or into a structured joint venture." *Id.* at 2212. The relevant functional inquiry is whether there is a conspiracy between "'separate economic actors pursuing separate economic interests,' such that the agreement 'deprives the marketplace of independent centers of decisionmaking.'" *Id.* (quoting *Copperweld*, 467 U.S. at 769) (citation omitted).

Applying this analysis, the Court in *American Needle* held that the licensing activities of National Football League Properties ("NFLP")—a corporate joint venture formed by the thirty-two National Football League teams to manage their intellectual property—constituted concerted action within the meaning of § 1. The Court concluded that "[a]lthough NFL teams have common interests such as promoting the NFL brand, they are still separate, profit-maximizing entities, and their interests in licensing team trademarks are not necessarily

aligned." *Id.* at 2213. Therefore, "[t]hirty-two teams operating independently through the vehicle of the NFLP are not like the components of a single firm that act to maximize the firm's profits. The teams remain separately controlled, potential competitors with economic interests that are distinct from NFLP's financial well-being." *Id.* at 2215. As a result, the Court held that the NFL teams and NFLP were appropriately subject to suit under § 1 for NFLP's licensing activities.

Appellants contend that the MLS rules at issue here are the product of independent action by agents of a single corporation. But the nature of defendants' alleged participation in the MLS joint venture fits squarely within *American Needle*'s definition of concerted conduct. Taking the factual claims in the complaints as true, the competitive relationship between the individual brokerages resembles that between the NFL teams. The MLS is comprised of individual real estate brokerages that are separately incorporated and that compete with each other in the sale and purchase of real estate. Like the NFL teams, each brokerage "is a substantial, independently owned, and independently managed business" that is "guided . . . [by a] 'separate corporate consciousness[ ]." *Id.* at 2212 (quoting *Copperweld*, 467 U.S. at 771). And therefore, like the NFL teams, the individual brokerages lack a "complete unity of interest" and "do not possess either the unitary decisionmaking quality or the single aggregation of economic power characteristic of independent action." *Id.*

The gravamen of the complaints here is that the brokerages colluded to use the MLS corporate vehicle to exclude lower cost brokerages from competing in the relevant real estate market and to stabilize prices within that market. The MLS enabled the individual brokerages to make collective decisions about pricing and services that they otherwise would have made independently. As in *American Needle*, this alleged collective action among potential competitors "depriv-[ed] the marketplace of independent centers of decisionmaking." *Id.* at 2213. Although appellants stress that the

defendants passed the MLS by-laws in their capacity as MLS board members, the relevant question is whether defendants acted "on interests separate from those of the firm itself." *Id.* at 2215. And it is clear that defendants' alleged efforts to exclude innovative competitors conflicted with the economic interest of the MLS to admit additional dues-paying members and to expand its database of property listings.

We emphasize, however, that even if some of the rules in question did happen to serve the interest of the MLS, this would not necessarily place defendants' conduct outside the scope of § 1. As the Court in *American Needle* noted, the NFL teams' economic interests "'will often coincide with those of the' NFLP 'as an entity in itself, [but] that commonality of interest exists in every cartel.'" *Id.* (citation omitted) (emphasis omitted). What matters is that, according to the allegations, the defendants remained "separately controlled, potential competitors with economic interests that [were] distinct from [the MLS's] financial well-being." *Id.*[1]

Our holding that § 1 applies is not meant to discredit the salutary economic function that an MLS may perform. An MLS may bring significant advantages to the market by, for example, dismantling "information and communication barriers" and easing "the built-in geographical barrier confronting the buyer-seller relationship." Arthur D. Austin, *Real Estate Boards and Multiple Listing Systems as Restraints of Trade*, 70 Colum. L. Rev. 1325, 1329 (1970). The joint venture thus provides a buyer with a "wider selection of purchase opportu-

---

[1]The Boland complaint also includes the CMLS as a defendant. Because the CMLS was allegedly used as an instrumentality of the individual brokerages, § 1 likewise applies to the CMLS with respect to the conduct at issue. *See id.* at 2214 ("[W]e think it clear that for the same reasons the 32 teams' conduct is covered by § 1, NFLP's actions also are subject to § 1, at least with regards to its marketing of property owned by the separate teams. NFLP's licensing decisions are made by the 32 potential competitors, and each of them actually owns its share of the jointly managed assets.").

nities" than is available from a single broker, *id.*, and this "integration of operations" enables an "expansion of output" within the real estate market. Joseph F. Brodley, *Joint Ventures and Antitrust Policy*, 95 Harv. L. Rev. 1521, 1525 (1982). But the power of MLS board members to pass restrictive membership rules can also threaten economic harm to nonmembers and deprive the real estate market of the competitive forces that are at the "heart of our national economic policy." *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978). Where MLS members have "the power to exclude other competitors from access to its pooled resources," there "exists the potential for significant competitive harms" alongside the "competitive advantages" of an MLS. *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1370 (5th Cir. 1980). Section one is therefore an appropriate mechanism to ensure that the concerted action of MLS members retains a procompetitive character.

### B.

Our analysis is consistent with several courts of appeals decisions that have applied § 1 to allegedly anticompetitive MLS rules and membership criteria. *See Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312 (7th Cir. 2006); *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2003); *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566 (11th Cir. 1991); *Pope v. Miss. Real Estate Comm'n*, 872 F.2d 127 (5th Cir. 1989); *Realty Multi-List, Inc.*, 629 F.2d 1351; *Penne v. Greater Minneapolis Area Bd. of Realtors*, 604 F.2d 1143 (8th Cir. 1979). Although in *Reifert* and *Pope* the courts ultimately concluded that § 1 was not violated, appellants have failed to point to a single court of appeals decision placing allegedly anticompetitive MLS conduct outside section one's coverage altogether.

In an effort to distinguish these cases, appellants argue that even if MLS board members are theoretically susceptible to § 1 claims, the complaints here fail to sufficiently plead that

defendants were engaged in anything more than intracorporate deliberations. *See Copperweld*, 467 U.S. 752. Specifically, appellants contend that it is fatal to the complaints that plaintiffs do not allege the existence of "separate economic actors pursuing separate economic interests" as required by *American Needle*. It is true that these exact words do not appear in the complaints, which were filed before *American Needle* was issued and which were not amended in its aftermath. But *American Needle* was decided at the summary judgment stage with the benefit of limited discovery. The decision does not suggest that a plaintiff must invoke the precise words of "separate economic actors pursuing separate economic interests" for a § 1 complaint against a joint venture to proceed past the pleading stage. Instead, it is sufficient that the facts in plaintiffs' complaints reasonably support such an inference. *See Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

It is clear from the complaints that the individual brokerages are economically separate from the MLS and from each other. The complaints identify each defendant as a distinct brokerage corporation licensed to do business in the MLS service area. Furthermore, plaintiffs allege that the "brokerages in the [MLS] Service Area are supposed to compete with each other to provide real-estate-brokerage services to customers." It is an obvious inference that as potential competitors within the MLS service area, defendants pursued separate economic interests.

In addition, plaintiffs pled facts which suggest that the defendants used the MLS corporate vehicle in a way that did not coincide with the MLS's economic interests. The complaints assert that the MLS purported to benefit the real estate market by aggregating information and expanding a database of property listings, but that the "[MLS] rules that defendants colluded to promulgate were not reasonably necessary to

achieve the pro-competitive benefits of the [MLS]." According to the complaints, whereas MLS members earn income through sales commissions, the MLS finances its services through the collection of membership dues. The complaints allege that the MLS board members "profited by illegally inhibiting competition," passing rules that restricted MLS membership in order to stabilize the price of brokerage services, but to the detriment of the MLS' own interest in new dues collection.

Our task here is not ultimately mechanical. The Supreme Court has emphasized that evaluating the sufficiency of a complaint is a "context-specific task that requires the reviewing court to draw" not only "on its judicial experience," but also on "common sense." *Iqbal*, 556 U.S. at 679. Although rules and practices may vary among MLSs, it is plain that a universal competitive dynamic governs the relationship between members of a local real estate trade association. After all, sales and commissions are finite, and competition for them is intense. As the Fifth Circuit has observed, "[w]hen a group of competitors like the members of [an MLS] join together to cooperate in the conduct of their business, there naturally arise antitrust suspicions." *Realty Multi-List, Inc.*, 629 F.2d at 1370; *see American Needle*, 130 S. Ct. at 2210 ("We have similarly looked past the form of a legally 'single entity' when competitors were part of professional organizations or trade groups.") (footnotes omitted). In this case, common sense is supported by concrete allegations that the defendants as natural competitors in the provision of real estate services combined to use the MLS as an instrumentality to maximize their individual profit. In these circumstances, it makes little sense to regard the actions and deliberations of the MLS as nothing more than intracorporate activity. Plaintiffs therefore sufficiently pled the plurality of actors necessary for § 1 to apply.

## III.

The fact that the MLS board members were separate economic actors capable of conspiring does not perforce establish

that plaintiffs sufficiently pled a conspiracy in restraint of trade under § 1. As this court explained in *Oksanen*, "[t]o conclude that [defendants] have the capacity to conspire among themselves does not mean, however, that every action taken by [defendants] satisfies the contract, combination, or conspiracy requirement of section one." 945 F.2d at 706. Appellants contend that plaintiffs failed to adequately plead the elements of the § 1 offense under the Supreme Court's recent decisions in *Iqbal*, 556 U.S. 662, and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

It is true that those decisions require more specificity from complaints in federal civil cases than was heretofore the case. The Supreme Court in *Twombly* articulated a "two-pronged approach" to assessing the sufficiency of a complaint. *Iqbal*, 556 U.S. at 679. First, a complaint must contain factual allegations in addition to legal conclusions. Federal Rule of Civil Procedure 8 "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Therefore, "'naked assertion[s]' devoid of 'further factual enhancement'" are not enough. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Second, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). Plausibility requires that the factual allegations "be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true." *Twombly*, 550 U.S. at 555; *see also Glassman v. Arlington Cnty.*, 628 F.3d 140, 145-46 (4th Cir. 2010).

Appellants insist that plaintiffs failed to plead either a conspiracy or a restraint of trade in the manner that *Iqbal* and *Twombly* require. For the reasons that follow, however, we think the complaints adequate to survive the motions to dismiss.

A.

As to the element of conspiracy itself, the complaints satisfied the pleading requirements set forth in *Twombly*. Plaintiffs' conclusion that defendants conspired is supported by alleged facts about the substance of their agreement. The complaints identify the defendants as individual brokerages serving together on the MLS board of trustees, allege that defendants "agreed . . . to develop, implement, enact, and facilitate the enforcement of unlawful [MLS] Rules," and describe the rules' content and allegedly anticompetitive purpose. For example, plaintiffs allege that defendants conspired to exclude innovative brokerages from the MLS by adopting "subjective standards for admission to membership," and by requiring that members maintain a physical office in the area, use a "standard, pre-approved contract," and offer only the "full array of services that brokerages traditionally have provided." The content of the rules, described in detail in the complaints, constitutes the factual matter establishing a plausible claim of conspiracy between the MLS board members.

Appellants contend that plaintiffs failed to plead necessary factual detail such as the times and locations of the allegedly conspiratorial meetings. *See Twombly*, 550 U.S. at 565 n.10 (noting that among other things, the defective complaint "mentioned no specific time, place, or person involved in the alleged conspiracies"). This argument, however, overlooks the difference between the complaints here and that at issue in *Twombly*, which had alleged "that major telecommunications providers had engaged in certain parallel conduct unfavorable to competition" and thus violated § 1. *Id.* at 548-49. The Court concluded that "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Id.* at 556. Evidence of parallel conduct alone was inadequate because of the "ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id.* at 554. Because to actually prove

a § 1 conspiracy requires "evidence that tends to exclude the possibility of independent action," *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984), allegations of parallel conduct in a complaint "must be placed in a context that raises a suggestion of a preceding agreement," *Twombly*, 550 U.S. at 557, as "distinct from identical, independent action," *id.* at 549.

*Twombly* required contextual evidence to substantiate a speculative claim about the existence and substance of a conspiracy. As the Court held, a § 1 conspiracy claim, "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 556. But there is no such uncertainty here about the terms of the agreement, let alone whether one was made. The complaints do not rest on evidence of parallel business conduct but on allegations that the MLS board members conspired in the form of the MLS rules, the very passage of which establishes that the defendants convened and came to an agreement. Circumstantial evidence sufficient to "suggest[ ] a preceding agreement," *id.* at 557, is thus superfluous in light of the direct evidence in the by-laws of the agreement itself. *See Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011) ("To adequately plead an agreement, a plaintiff must plead either direct evidence of an agreement *or* circumstantial evidence.") (emphasis added); *see also Monsanto*, 465 U.S. at 768 (holding that to prove a § 1 conspiracy "there must be direct *or* circumstantial evidence that reasonably tends to prove . . . a conscious commitment to a common scheme designed to achieve an unlawful objective") (emphasis added).

Conspiracies are often tacit or unwritten in an effort to escape detection, thus necessitating resort to circumstantial evidence to suggest that an agreement took place. Here, by contrast, the concerted conduct is both plainly documented and readily available so that plaintiffs can describe the factual content of the agreement without the benefit of extended discovery. *Twombly*'s requirements with respect to allegations of

illegal parallel conduct are inapplicable where, as here, the concerted conduct is not a matter of inference or dispute.

B.

The remaining question, therefore, is whether plaintiffs adequately pled the second element of a § 1 violation—that the conspiracy imposed an unreasonable restraint of trade. Because trade associations may be protective of consumer interests and not just inimical to them, the cooperative actions of MLS members are not per se unreasonable. As the district court properly noted, the restraints at issue should be evaluated at the merits stage according to the rule of reason, traditionally applied to joint venture cooperation that has possible procompetitive justifications. *See, e.g.*, *Copperweld*, 467 U.S. at 768 ("[C]ombinations, such as . . . joint ventures, . . . hold the promise of increasing a firm's efficiency and enabling it to compete more effectively. Accordingly, such combinations are judged under a rule of reason . . . ."); *American Needle*, 130 S. Ct. at 2207 (holding that the "legality of [the NFL teams'] concerted action must be judged under the Rule of Reason").

Under the rule of reason, "'the reasonableness of a restraint is evaluated based on its impact on competition as a whole within the relevant market.' This evaluation requires a showing of 'anticompetitive effect,' resulting from the agreement in restraint of trade." *Dickson*, 309 F.3d at 206 (quoting *Oksanen*, 945 F.2d at 708). Contrary to appellants' insistence, we conclude that plaintiffs state a plausible claim to relief under *Twombly*, asserting facts which plausibly suggest that the MLS rules harmed market competition. The complaints allege six anticompetitive effects resulting from defendants' conspiracy and the precise MLS rules that led to those effects.

With respect to anticompetitive effects, plaintiffs allege that defendants' conspiracy in the form of the MLS rules:

unreasonably (1) raised entry barriers for potential competitors by imposing burdensome prerequisites for membership; (2) provided a means of identifying potentially aggressive competitors so defendants could exclude them from [MLS] membership; (3) stabilized the price of real-estate-brokerage services through the prospect of price controls; (4) deterred the emergence of Internet-based brokerages; (5) stabilized the price of, and reduced customer options for, real-estate-brokerage services by dictating the services that all brokerages in the [MLS] Service Area had to provide; and (6) discouraged entry of potential competitors who raised funds through public ownership.

These particular conclusions are supported by alleged facts about how the MLS rules were designed to achieve these anticompetitive results. Both the HHMLS and CMLS are alleged to have exercised substantial market power by virtue of primarily serving areas served by no other MLS, making membership in the MLS necessary for a brokerage in those areas to successfully compete in the provision of real estate services. *See* Herbert Hovenkamp, *Exclusive Joint Ventures and Antitrust Policy*, 1995 Colum. Bus. L. Rev. 1, 101 ("[E]xclusion from membership in a real estate multiple listing service is practically tantamount to exclusion from the real estate profession.").

Given the market power of the MLSs, plaintiffs enumerate rules that they allege cumulatively enabled the defendants to exclude lower-cost brokerages from effectively competing in the local real estate markets. For example, the MLS rules prohibited members from offering alternative contractual terms and operating a "fee-for-service" business model, which would have allowed a seller who found a buyer on his own to avoid payment of a commission to the brokerage. Other rules operated to restrict lower-priced and consumer-friendly internet competition by excluding brokerages without a physi-

cal office in the MLS area and brokerages that did not primarily do business in the MLS service area or hold a South Carolina real-estate license as their primary license. Member-brokerages were required to reside within the MLS service area and operate their offices only during hours deemed reasonable by the MLS. According to the complaints, such rules denied customers the benefit of additional service choices and of lower prices that would have been the product of more robust competition.

Appellants argue that the complaints are deficient because they contain no facts "tending to show what the prices for real estate brokerage services were before, during, or after what is alleged as the class period of 2001-2007, thus preventing the drawing of any inference as to whether prices went up, down, or stayed the same in that time frame." Appellants' Br. at 33-34. But *Iqbal* and *Twombly* do not require a plaintiff to prove his case in the complaint. The requirement of nonconclusory factual detail at the pleading stage is tempered by the recognition that a plaintiff may only have so much information at his disposal at the outset. A "complaint need not 'make a case' against a defendant or '*forecast evidence* sufficient to *prove* an element' of the claim. It need only '*allege facts* sufficient to *state* elements' of the claim." *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 349 (4th Cir. 2005) (emphases in original) (citations omitted). It is sufficient that the alleged anticompetitive effects are economically plausible in light of the MLS restrictions recounted in the complaint.[2]

---

[2]Plaintiffs additionally alleged that defendants fraudulently concealed their illegal conduct and that the applicable statute of limitations must therefore be tolled. Pursuant to the district court's broadly worded 1292(b) certification, we also granted plaintiffs' petition for permission to appeal the district court's dismissal of their fraudulent concealment claims. On this issue, we also affirm. The district court properly concluded that plaintiffs failed to "allege affirmative acts of concealment or affirmative steps to mislead" and that "plaintiffs' allegations amount to no more than a failure to admit to wrongdoing, which does not suffice." *See Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218-19 (4th Cir. 1987).

IV.

We cannot know at this early stage whether plaintiffs will ultimately prevail. Whether defendants' conduct indeed violated the Sherman Act is a question to be answered on remand. To prevail, plaintiffs must prove that the MLS rules caused anticompetitive harms which outweighed any procompetitive justification. *See Bd. of Trade of City of Chi. v. United States*, 246 U.S. 231, 238 (1918). Plaintiffs allege that "[t]he MLS rules that defendants colluded to promulgate were not reasonably necessary to achieve the pro-competitive benefits of the MLS." But in response, appellants raise potential legitimate business purposes that may justify the rules as promoting competition within the relevant real estate markets.

For example, MLS rules that impose professional standards or police access to membership may serve to ensure compliance with state regulations and to prevent fraud upon consumers rather than to exclude lower-priced competition. On the one hand, licensing or residency requirements may serve as illegitimate barriers to market entry, while on the other they may act as legitimate tools to increase the trustworthiness of the real estate trade. At this early stage of the litigation, we are not in a position to weigh the alleged anticompetitive risks of the MLS rules against their procompetitive justifications. This rule of reason inquiry is best conducted with the benefit of discovery and we thus express no view on the merits of the litigation beyond recognizing the sufficiency of the complaints. We therefore affirm the judgment of the district court and remand for further proceedings consistent with this opinion.

*AFFIRMED AND REMANDED*