**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————

No. 11-2062

—————

LOREN DATA CORPORATION,

　　　　　　Plaintiff - Appellant,

　　v.

GXS, INC.,

　　　　　　Defendant - Appellee.

—————

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Deborah K. Chasanow, Chief District Judge. (8:10-cv-03474-DKC)

—————

Argued: September 20, 2012　　　Decided: December 26, 2012

—————

Before NIEMEYER and KEENAN, Circuit Judges, and Michael F. URBANSKI, United States District Judge for the Western District of Virginia, sitting by designation.

—————

Affirmed by unpublished opinion. Judge Urbanski wrote the opinion, in which Judge Niemeyer and Judge Keenan joined.

—————

**ARGUED:** Glenn B. Manishin, TROUTMAN SANDERS, LLP, Washington, D.C., for Appellant. Robert A. Schwinger, CHADBOURNE & PARKE, LLP, New York, New York, for Appellee. **ON BRIEF:** David H. Evans, CHADBOURNE & PARKE, LLP, Washington, D.C.; Benjamin D. Bleiberg, CHADBOURNE & PARKE, LLP, New York, New York, for Appellee.

—————

Unpublished opinions are not binding precedent in this circuit.

URBANSKI, District Judge:

Loren Data Corporation ("Loren Data") filed a complaint against GXS, Inc. ("GXS") alleging violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, the Maryland antitrust statute, as well as common law claims of tortious interference and breach of contract. The district court granted GXS's motion to dismiss Loren Data's antitrust claims. Because the district court correctly recognized that Loren Data failed to allege a plausible conspiracy in restraint of trade in violation of Section 1 of the Sherman Act or facts sufficient to state a plausible Section 2 claim, we affirm.

I.

Loren Data and GXS are engaged in the Electronic Data Interchange industry. Electronic Data Interchange ("EDI") is the transfer and exchange of business data from one computer system to another using a standard digital format. EDI messages are generated, sent, and received by business computing systems for parties engaged in commercial trading, and often include the transmission of business information such as invoices and purchase orders. EDI messages travel over secure, private data networks called Value Added Networks ("Networks"). Both GXS and Loren Data operate such Networks. Loren Data alleges that the GXS Network is the market leader, and this case concerns GXS's

2

refusal to allow Loren Data to connect to the GXS Network in the manner sought by Loren Data.

Networks transfer business information in two ways, referred to in the industry as a non-settlement peer interconnect ("peer interconnect") and a commercial mailbox. When data is transmitted over a peer interconnect, each Network bears its own costs associated with the transfer of data, and neither Network charges the other for the data transmission. In contrast, Networks communicating via a commercial mailbox charge each other based on the volume of data transferred. Loren Data alleges that a peer interconnect is the industry standard and that a commercial mailbox is cumbersome, inefficient, and expensive. While Loren Data has had access to the GXS Network by means of a commercial mailbox, it charges a violation of the antitrust laws because GXS has refused to grant it a peer interconnect.

Loren Data's efforts to obtain a peer interconnect from GXS span the last decade. The amended complaint alleges that Loren Data began negotiations with GXS to secure a peer interconnect in November 2000. While negotiations were underway, GXS made a commercial mailbox available to Loren Data as an interim solution. In August 2001, GXS declined Loren Data's request for a peer interconnect and notified Loren Data that it would terminate the commercial mailbox if $30,000.00 in

3

overdue fees owed by Loren Data were not paid. When Loren Data did not pay the overdue fees, GXS terminated the commercial mailbox. Loren Data approached GXS again in 2002 to establish a peer interconnect, but that request too was denied.

In August 2003, Loren Data again approached GXS about a peer interconnect, this time because a potential customer, Covisint, required routing to commercial trading partners on the GXS Network. Although Loren Data had, by this time, settled its outstanding accounts with GXS, GXS declined to provide a peer interconnect, again offering a commercial mailbox. Despite the fact that Loren Data could only offer Covisint a commercial mailbox connection to the GXS Network, Covisint contracted with Loren Data.[1]

Matters came to a head in 2010. In a letter dated September 3, 2010, GXS addressed the terms under which it was willing to do business with Loren Data. This letter, attached

---

[1] While the commercial mailbox relationship between Loren Data and GXS has been the norm over the last decade, there have been exceptions. From 2005 to 2009, GXS allowed Loren Data a peer interconnect for traffic pursuant to an outsourcing contract between Loren Data and IBM. In 2009, Loren Data signed a transit agreement with Inovis, Inc. which gave Loren Data indirect access to the GXS Network through the InovisWorks Network. Loren Data alleges that GXS indicated that it would not renew or extend the InovisWorks transit agreement upon its expiration in May 2011.

4

as an exhibit to the amended complaint, forms the core of Loren Data's Sherman Act Section 1 conspiracy allegation.

In the September 3, 2010 letter, GXS explained that it could not offer Loren Data anything more than a commercial mailbox because it believed Loren Data's business model to be incompatible with its own. GXS characterized Loren Data's business model as a "service bureau." As a "service bureau," GXS asserted that Loren Data was focused exclusively on selling a connection to the GXS Network and did not provide the value associated with other Networks, which GXS contended are focused on growing the overall EDI market.

GXS also expressed concern that providing a peer interconnect to Loren Data would result in service quality problems. GXS stated that the core of Loren Data's business model involves message "daisy chaining." GXS distinguished daisy chaining from the "one-hop" approach employed by GXS in which "messages traverse one network and stop." In contrast, daisy chaining allows a message to hop from Network to Network. According to GXS, "[a] proliferation of daisy chaining increases GXS['s] risks in its ability to manage service latency, availability, and overall service quality." The September 3, 2010 letter stated that GXS's current Network interconnect agreements expressly prohibit daisy chaining.

The amended complaint alleges that both GXS and Loren Data have peer interconnect agreements with all of the 36 other EDI Networks. Regardless, Loren Data alleges that peer interconnect access to the GXS Network is essential to competition because that Network controls over 50 percent of the market. Although Loren Data alleges a concerted refusal to deal, the amended complaint states that "[c]urrently about 55% of Loren Data's business travels on GXS [Networks]."

## II.

Loren Data filed a complaint on December 13, 2010 alleging that GXS's refusal to provide it a peer interconnect to the GXS Network violated Sections 1 and 2 of the Sherman Act, the Maryland antitrust statute, and the common law. GXS moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). In response to GXS's motion to dismiss, Loren Data filed an amended complaint, which incorporated the original complaint, introduced supplemental facts, and attached the September 3, 2010 letter, which it believed evidenced the agreement to restrain trade.

On August 9, 2011, the district court dismissed the action. The district court reasoned that Loren Data failed to allege specific facts in support of a Section 1 conspiracy, and, in fact, the facts alleged suggest the absence of an agreement

6

in restraint of trade. As to the Section 2 monopolization claim, the district court held that Loren Data did not properly allege a plausible essential facilities claim or that the alleged refusal to deal constituted unlawful exclusionary conduct. The district court also held that Loren Data's attempted monopolization claim did not sufficiently allege the specific intent to monopolize or a dangerous probability of successful monopolization.

Loren Data filed two post-judgment motions that the district court construed as motions to alter judgment pursuant to Federal Rule of Civil Procedure 59(e). In those motions, Loren Data sought clarification as to whether the case was dismissed with or without prejudice and reconsideration of the dismissal. The court denied the motions and ordered that the case be dismissed with prejudice. This appeal followed.[2]

III.

An order granting dismissal under Rule 12(b)(6) is reviewed de novo. See E.I. du Pont de Nemours & Co. v. Kolon

---

[2] Loren Data did not appeal the district court's rulings as to its Maryland common law claims and those portions of its Maryland antitrust claims that do not parallel its Sherman Act claims. As such, these claims are not addressed herein. Likewise, there is no need to undertake separate analysis of the parallel Maryland antitrust claims, as resolution of those claims is subsumed in the Sherman Act analysis.

<u>Indus.</u>, 637 F.3d 435, 440 (4th Cir. 2011). The Supreme Court in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007), articulated a two-pronged approach to assessing the sufficiency of a complaint. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 679 (2009). First, the complaint must allege facts sufficient to support the legal conclusions in the complaint, as Federal Rule of Civil Procedure 8 requires "more than labels and conclusions," and admonishes against "a formulaic recitation of the elements of a cause." <u>Twombly</u>, 550 U.S. at 555. Second, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 557). Plausibility requires that the factual allegations "be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true." <u>Twombly</u>, 550 U.S. at 555; <u>see</u>, <u>e.g.</u>, <u>Robertson v. Sea Pines Real Estate Companies, Inc.</u>, 679 F.3d 278, 288 (4th Cir. 2012).

In the context of an agreement to restrain trade, <u>Twombly</u> teaches that a court may not simply credit conclusory allegations of conspiracy. 550 U.S. at 555. Rather, the court must determine whether the well-pleaded, non-conclusory factual allegations give rise to a "plausible suggestion of conspiracy." <u>Id.</u> at 565-66. As the district

8

court correctly concluded, the factual allegations in this case fail to reach that level.

## IV.

### A.

Count I of Loren Data's amended complaint alleges a violation of Section 1 of the Sherman Act. Section 1 of the Sherman Act states that: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. To establish a Section 1 violation, a plaintiff must prove, and therefore plead, "(1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." Dickson v. Microsoft Corp., 309 F.3d 193, 202 (4th Cir. 2002).

"Not every instance of cooperation between two people is a potential 'contract, combination . . . or conspiracy, in restraint of trade.'" Am. Needle, Inc. v. Nat'l Football League, 130 S. Ct. 2201, 2208 (2010). The term "contract, combination . . . or conspiracy" in Section 1 applies only to concerted action, and not unilateral activity. Id. (citing Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 761 (1984)). The Sherman Act proscribes concerted action because it is "fraught with anticompetitive risk" and "deprives

9

the marketplace of the independent centers of decision-making that competition assumes and demands." Robertson, 679 F.3d at 284 (internal citations omitted). The purpose of the distinction "between concerted and independent action [is] to deter anticompetitive conduct and compensate its victims, without chilling vigorous competition through ordinary business operations." Id.

More particularly, concerted activity is prohibited by Section 1 when "multiple parties join their resources, rights, and economic power together in order to achieve an outcome that, but for concert, would naturally be frustrated by their competing interests (by way of profit maximizing choices)." Va. Vermiculite, Ltd. v. Historic Green Springs, Inc., 307 F.3d 277, 282 (4th Cir. 2002). Thus, Section 1 does not include "the entire body of private contract," and a business generally has "the right to deal or not deal with whomever it likes, as long as it does so independently." Laurel Sand & Gravel, Inc. v. CSX Transp., Inc., 924 F.2d 539, 542 (4th Cir. 1991).

To adequately plead a Section 1 conspiracy, the complaint must allege a factual basis plausibly suggesting that concerted activity led to an agreement to restrain trade. See Twombly, 550 U.S. at 556. Specifically, when concerted conduct is a matter of inference, a plaintiff must include evidence that places the parallel conduct in "context

10

that raises a suggestion of a preceding agreement" as "distinct from identical, independent action." Id. at 549, 556; see also Robertson, 679 F.3d at 289.

"Conspiracies are often tacit or unwritten in an effort to escape detection, thus necessitating resort to circumstantial evidence to suggest that an agreement took place." Robertson, 679 F.3d at 289-90. There are no allegations in this case suggestive of such circumstantial evidence of conspiracy. Rather, Loren Data relies on the reference in the September 3, 2010 letter to the prohibition on daisy chaining in the GXS Network interconnect agreements to meet Section 1's concerted action requirement. Loren Data reads the daisy chaining ban contained in the GXS interconnect agreements as evidence of collusion between GXS and each of the other 36 Networks to boycott Loren Data.

Merely pleading or pointing to an express contract is not enough to show that an actual conspiracy to restrain trade is afoot, however. A reviewing court must "take account of the absence of a plausible motive to enter into the alleged . . . conspiracy." Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 595 (1986). "[C]ourts should not permit factfinders to infer conspiracies when such inferences are implausible, because the effect of such practices is often to deter procompetitive conduct." Id. at 593 (citing Monsanto

11

Co. v. Spray-Rite Service Corp., 465 U.S. 752, 762-64 (1984). If the alleged co-conspirators "had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." Matsushita, 475 U.S. at 596-97 (citing First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 278-80 (1968). The evidence must tend to exclude the possibility that the alleged co-conspirators acted independently, and the alleged conspiracy must make practical, economic sense. Matsushita, 475 U.S. at 597-98 (citing Monsanto, 465 U.S. at 764).

Here, the allegations do not meet this standard. The September 3, 2010 letter does not provide any indication that other Networks have acquiesced or joined in any kind of conspiracy to boycott Loren Data, much less taken any action against Loren Data. The letter merely suggests that GXS was unwilling to contract with Loren Data on the terms it sought and provides no evidence that others agreed to boycott Loren Data. Indeed, it is difficult, if not impossible, to reconcile Loren Data's allegation that the September 3, 2010 letter is direct evidence of a conspiracy against Loren Data with a full examination of the terms of that letter. When read in its entirety, the letter explains that Loren Data's daisy chain business model raises service quality concerns for the GXS

12

Network.  To address the service quality problems posed by daisy chaining, GXS proposed a new commercial relationship with Loren Data.  As such, the September 3, 2010 letter is hardly suggestive of an unlawful conspiracy or an agreement to boycott Loren Data.  Rather, it simply explains the terms on which GXS was willing to contract with Loren Data.

Moreover, as the district court recognized, the facts alleged by Loren Data contradict any inference of conspiracy. Loren Data simultaneously alleges: (1) that GXS contracted with all other Networks to exclude Loren Data from obtaining a peer interconnect with GXS; yet (2) Loren Data was able to obtain peer interconnects with all of these allegedly boycotting Networks.  The fact that Loren Data was able to interconnect with all of these other Networks negates any suggestion that these Networks conspired with GXS to boycott Loren Data.  These facts do not support an allegation of a Section 1 conspiracy; rather, they are consistent with unilateral conduct by GXS to protect its Network from the service quality perils it perceived to be associated with daisy chaining.

Given the fact that Loren Data was able to interconnect freely with so many other Networks, the letter of September 3, 2010 cannot plausibly be read as evidence of concerted action.  Rather, it reflects GXS's unilateral business judgment as to the parameters under which it was willing to deal

13

with Loren Data, an entity it viewed as having an incompatible business model.  Monsanto, 465 U.S. at 761 ("A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently . . . . And a distributor is free to acquiesce in the manufacturer's demand in order to avoid termination.").  Given the facts alleged in the amended complaint, the conspiracy posited by Loren Data simply makes no practical or economic sense.  As such, the district court correctly concluded that the Sherman Act Section 1 claim fails as a matter of law.

V.

Counts II and III of Loren Data's amended complaint allege violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, which make it illegal to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations."  Loren Data challenges the district court's decision to dismiss both its monopolization and attempted monopolization claims.

A.

To state a monopolization claim under Section 2, two elements must be demonstrated: (1) the possession of monopoly

14

power in the relevant market[3] and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. United States v. Grinnell Corp., 384 U.S. 563, 570-571 (1966); Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004) ("Trinko"). The Supreme Court in Trinko noted that the possession of monopoly power is only unlawful when it is coupled with anticompetitive conduct. 540 U.S. at 407. To violate Section 2 of the Sherman Act, a defendant must engage in conduct "to foreclose competition, gain a competitive advantage, or to destroy a competitor." E.I. DuPont de Nemours, 637 F.3d at 450 (citing Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 482-83 (1992)). The anticompetitive conduct

---

[3] Monopoly power is defined as "the power to control prices or exclude competition." United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391 (1956). "Proof of a relevant market is the threshold for a Sherman Act § 2 claim. The plaintiff must establish the geographic and product market that was monopolized." Consul, Ltd. v. Transco Energy Co., 805 F.2d 490, 493 (4th Cir. 1986). The district court questioned whether Loren Data's "inconclusive statements as to geographic market are adequate to state a claim," Loren Data Corp. v. GXS, Inc., No. DKC 10-3474, 2011 WL 3511003, at *6 (D. Md. Aug. 9, 2011), but noted that it need not reach that issue "because Loren Data's claim has other failings." Id. at *7. As to the relevant product market alleged by Loren Data, the EDI industry, the district court concluded that "it cannot be said that Loren Data has failed to plead a relevant product market in terms sufficient to state a claim." Id.

requirement reflects the essence of an antitrust violation, that of harm to competition, rather than to an individual competitor. Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc., 376 F.3d 1065, 1075 (11th Cir. 2004). The Supreme Court has explained that "[e]ven an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws." Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 225 (1993). "The [Act] directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." Spectrum Sports Inc. v. McQuillan, 506 U.S. 447, 458 (1993). "That is, it must harm the competitive *process* and thereby harm consumers. In contrast, harm to one or more *competitors* will not suffice." United States v. Microsoft Corp., 253 F.3d 34, 70-71 (D.C. Cir. 2001) (en banc) (emphasis in original).

Loren Data alleges that GXS's anticompetitive behavior is evidenced by its refusal to provide it a peer interconnect and this refusal is a denial of access to an essential facility.

i.

The Sherman Act "does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent

16

discretion as to parties with whom he will deal." United States v. Colgate & Co., 250 U.S. 300, 307 (1919). Nevertheless, "[t]he high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified." Trinko, 540 U.S. at 408 (citing Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 601 (1985)).

In Trinko, the Court observed that exceptions to the right to refuse to deal should be recognized with caution due to the "uncertain virtue of forced sharing and the difficulty of indentifying and remedying anticompetitive conduct by a single firm." Id. Specifically, the Court noted that Aspen Skiing represented an exception to this rule and is situated "at or near the outer boundary of § 2 liability." Id. The Aspen Skiing exception applies when "[t]he unilateral termination of a voluntary (and thus presumably profitable) course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end." Id.

Loren Data's attempt to analogize this case to Aspen Skiing is unpersuasive. GXS has not refused to deal with Loren Data. Indeed, in the September 3, 2010 letter, GXS proposed terms for a commercial relationship with Loren Data. There is no suggestion, and the amended complaint does not allege, that this offer of a new commercial agreement was some sort of sham

17

or that GXS would renege on its proposal; rather, Loren Data was not satisfied with its terms.

Loren Data counters that a commercial mailbox arrangement is not a viable alternative to a peer interconnect. But simply because GXS does not offer Loren Data the terms and conditions it desires does not mean that GXS has violated the antitrust laws. Indeed, GXS provides legitimate business justifications for the terms it offers Loren Data. Cf. Laurel Sand & Gravel, 924 F.2d at 544 (noting that anticompetitive exclusionary conduct may be shown if "there was no legitimate business reason for its conduct."). Plainly, as GXS explains in its September 3, 2010 letter, there are ample business justifications for its decision not to deal with Loren Data on the terms Loren Data wants.

Nor does the alleged failure of GXS to contract with Loren Data on those terms work to deprive the market of vigorous competition. GXS granted peer interconnects to every other Network, large or small, and the district court correctly concluded that "GXS is not likely to gain monopoly control over the industry if it refuses to deal with only one of 36 available VAN networks." Loren Data Corp., 2011 WL 3511003, at *11. Not only does GXS interconnect with the 36 other Networks, Loren Data was able to do so as well. Further, even though Loren Data was not able to obtain a peer interconnect with GXS, its

18

allegations acknowledge that more than half of its business traveled on the GXS Network. Simply put, Loren Data's allegations that it is able to access 36 other Networks and that more than half of its business traversed the GXS Network negates any plausible inference of anticompetitive exclusionary conduct by GXS. Loren Data argues that smaller EDI consumers are harmed by GXS's exclusionary conduct because accessing the GXS Network through another Network is more expensive. But Loren Data offers no facts to support its conclusory assertion that smaller EDI consumers have been denied access or are otherwise unable to obtain EDI services because of cost. In short, Loren Data has failed to allege a plausible claim of exclusionary conduct directed to competition as a whole.

ii.

Loren Data also alleges that the GXS Network is an essential facility, the denial of access to which violates Section 2. The Supreme Court has not adopted the essential facilities doctrine. Trinko, 540 U.S. at 411 ("We have never recognized such a doctrine . . . and we find no need either to recognize it or repudiate it here."). Nevertheless, we considered such a claim in Laurel Sand & Gravel. 924 F.2d at 544.

19

Under such a theory, a refusal by a monopolist to deal "may be unlawful because a monopolist's control of an essential facility (sometimes called a 'bottleneck') can extend monopoly power from one stage of production to another, and from one market into another. Thus, the antitrust laws have imposed on firms controlling an essential facility the obligation to make the facility available on non-discriminatory terms." MCI Commc'ns Corp. v. Am. Tel. & Tel. Co._, 708 F.2d 1081, 1132 (7th Cir.), cert. denied, 464 U.S. 891 (1983). "[T]he central concern in an essential facilities claim is whether market power in one market is being used to create or further a monopoly in another market." Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp., 910 F.2d 139, 150 (4th Cir. 1990).

In order to proceed on an essential facilities claim, four elements must be proven: "(1) control by the monopolist of the essential facility; (2) the inability of the competitor seeking access to practically or reasonably duplicate the facility; (3) the denial of the facility to the competitor; and (4) the feasibility of the monopolist to provide the facility." Laurel Sand & Gravel, 924 F.2d at 544 (citing MCI Commc'ns Corp., 708 F.2d at 1132). The owner of an essential facility is not obligated to make it available under whatever terms the competitor wishes; the owner need only offer access under reasonable terms. Id. Moreover, terms are not

20

unreasonable simply because they will reduce a competitor's profits. Id.

The amended complaint does not sufficiently allege that GXS is an essential facility. First, Loren Data cannot plausibly maintain that a peer interconnect with GXS is essential. Although Loren Data complains that GXS has repeatedly denied it a peer interconnect, it alleges that more than half of its EDI business travels over the GXS Network. Moreover, Loren Data has established peer interconnects with three dozen other Networks. The fact that the majority of Loren Data's business traversed the GXS Network without a peer interconnect demonstrates the fallacy of the claim that a peer interconnect is essential to competition. Second, there is no indication that the new commercial agreement offered to Loren Data by GXS in the September 3, 2010 letter is an unreasonable alternative to the terms Loren Data seeks. Loren Data's history with Covisint further illustrates this point. Covisint required Loren Data to have access to the GXS Network as part of its prospective contract agreement. Even though Loren Data was able to connect to the GXS Network only through a commercial mailbox, Covisint still decided to contract with Loren Data. While a peer interconnect with GXS may suit Loren Data better, it is plainly not essential.

At its core, Loren Data's amended complaint does not plausibly allege the denial of access to an essential facility. Loren Data has functioned for a decade without unfettered peer interconnect access to the GXS Network it now claims is essential. Even were access to the GXS Network essential for Loren Data to compete, GXS offered Loren Data access to its Network on terms acceptable to GXS as set forth in the September 3, 2010 letter. For both of these reasons, this case does not present a plausible essential facilities claim.

B.

Loren Data also argues that the district court erred in dismissing its attempted monopolization claim. To state a claim for attempted monopolization, a plaintiff must demonstrate: (1) a specific intent to monopolize the relevant market; (2) predatory or anticompetitive acts in furtherance of the intent; and (3) a dangerous probability of success. Spectrum Sports, Inc., 506 U.S. at 456. The district court held that Loren Data failed to allege facts demonstrating a specific intent to monopolize or a dangerous probability that GXS would succeed in establishing a monopoly. We agree.

Loren Data has not sufficiently alleged that GXS had a specific intent to monopolize. Indeed, Loren Data alleges just the opposite – that GXS grants peer interconnects to every other

22

Network, both large and small – which is entirely inconsistent with an intent to monopolize. Nor does Loren Data allege a dangerous probability of successful monopolization by GXS. Loren Data characterizes two acquisitions by GXS over a ten year period as an aggressive campaign to monopolize. Loren Data cites M & M Medical Supplies & Service, Inc. v. Pleasant Valley Hospital, Inc., 981 F.2d 160, 168 (4th Cir. 1992), for the proposition that a rising market share is sufficient to show a dangerous probability of achieving monopoly power. However, in M & M Medical, we held that "[o]ther factors must be considered, such as ease of entry, which heralds slight chance of success [of achieving monopoly power], or exclusionary conduct without the justification of efficiency, which enhances the likelihood of success [of achieving monopoly power]." Id. Loren Data's complaint and amended complaint are devoid of any factual allegation suggesting that GXS's rising market share was coupled with any exclusionary conduct. Inconsistent with Loren Data's theory is its allegation that GXS established peer interconnects with 36 other Networks, conduct which is hardly suggestive of an attempt to monopolize the EDI market. In sum, the fact that GXS has contracted with every other Network in the market suggests that its refusal to deal with Loren Data on the terms Loren Data desires will not have any negative effects on competition as a whole.

VI.

Finally, Loren Data argues that the district court erred in denying its post-judgment motions. Loren Data filed a "motion for clarification" asking the district court to issue a revised or supplemental order stating whether its claims were dismissed with or without prejudice. Before this motion was ruled on, Loren Data filed another motion asking the district court to reconsider its order granting GXS's motion to dismiss. The district court construed both of these motions as motions to alter judgment pursuant to Federal Rule of Civil Procedure 59(e).

The reconsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly. Pac. Ins. Co. v. Am. Nat'l Ins. Co., 148 F.3d 396 (4th Cir. 1998). We review the denial of a Rule 59(e) motion under the deferential abuse of discretion standard. Ingle ex rel. Estate of Ingle v. Yelton, 439 F.3d 191, 197 (4th Cir. 2006). Rule 59(e) provides that a court may alter or amend the judgment if the movant shows (1) an intervening change in the controlling law, (2) new evidence that was not available at trial, or (3) that there has been a clear error of law or a manifest injustice. Id.; see e.g., Robinson v. Wix Filtration Corp. LLC, 599 F.3d 403 (4th Cir. 2010). It is the moving party's burden

to establish one of these three grounds in order to obtain relief under Rule 59(e).

The district court did not abuse its discretion in denying Loren Data's motions. As there was no suggestion of a change in intervening law or new facts, Loren Data was left to argue that a clear error of law or manifest injustice occurred. As the foregoing analysis of Loren Data's claims makes plain, the dismissal of Loren Data's antitrust claims was neither. Nor was it a clear error of law for the district court to dismiss the case without first making a specific finding that an additional opportunity to amend the complaint would be futile. In ruling on the post-judgment motions, the district court made it abundantly clear that any amendment to the complaint would be futile for two reasons. First, Loren Data had already amended the complaint once before, suggesting that further amendment would be futile. Second, Loren Data provided nothing of additional substance to the district court to demonstrate that a dismissal without prejudice would be fruitful. Plainly, the district court did not abuse its discretion in denying Loren Data's post-judgment motions.

VII.

For these reasons, the judgment of the district court is affirmed.

AFFIRMED